**Filed:  July 19, 2012**

IN THE SUPREME COURT OF THE STATE OF OREGON

JEFFREY WILLEMSEN,
as Personal Representative of the
Estate of KARLENE J. WILLEMSEN,
and JAMES WILLEMSEN,

Plaintiffs-Adverse Parties,

v.

INVACARE CORPORATION,
a foreign corporation;
UNITED SEATING & MOBILITY,
a foreign limited liability company;
MOTION CONCEPTS, INC.,
a foreign corporation;
PERPETUAL MOTION ENTERPRISES, LTD,
a foreign corporation;
PASS & SEYMOUR, INC.,
a foreign corporation;
SIEMENS CORPORATION,
a foreign corporation;
SIEMENS INDUSTRY, INC.,
f/k/a/ Siemens Energy and Automation, Inc.,
a foreign corporation;
SUMMERS GROUP, INC.,
dba REXEL,
a foreign corporation;
and GAW ELECTRIC, INC.,
an Oregon  corporation,

Defendants,

and

CHINA TERMINAL & ELECTRIC CORP.,
a foreign corporation;
CTE TECH CORP.,
a foreign corporation,

Defendants-Relators.

(CC 0902-01653; SC S059201)

En Banc

Original proceeding in mandamus.*

Argued and submitted May 3, 2012, at Portland Community College, Cascade Campus, Portland.

Jonathan M. Hoffman, Martin Bischoff Templeton Langslet & Hoffman LLP, Portland, argued the cause for Defendants-Relators. Joan L. Volpert, Portland, filed the brief for Defendants-Relators. With her on the brief were Jonathan M. Hoffman and Mary-Ann S. Rayburn.

Kathryn H. Clarke, Portland, argued the cause and filed the brief for Adverse Parties. With her on the brief was Jeffrey A. Bowersox.

Gregory S. Pitcher, Williams, Kastner & Gibbs PLLC, Portland, filed the brief for *amicus curiae* Product Liability Advisory Committee, Inc.

Lisa T. Hunt, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

KISTLER, J.

The alternative writ of mandamus is dismissed.

*On petition for writ of mandamus from an order of Multnomah County Circuit Court, Richard C. Baldwin, Judge.

KISTLER, J.

Defendant CTE Tech Corp. is a Taiwanese corporation that manufactures battery chargers.[1] Defendant Invacare Corporation is an Ohio corporation that manufactures motorized wheelchairs. CTE agreed to supply Invacare with battery chargers built to Invacare's specifications, which Invacare then sold with its motorized wheelchairs in Oregon and the rest of the United States. Plaintiffs brought this action against CTE after their mother died in a fire allegedly caused by a defect in CTE's battery charger. CTE moved to dismiss plaintiffs' claims against it on the ground that Oregon lacks personal jurisdiction over it. CTE reasoned that due process would permit an Oregon court to exercise personal jurisdiction over it only if CTE had purposefully availed itself of the privilege of doing business here. In CTE's view, the fact that it sold its battery chargers to Invacare in Ohio, which sold them together with its wheelchairs in Oregon, was not sufficient to meet that standard.

The trial court denied CTE's motion, and we denied CTE's petition for a writ of mandamus directing the trial court to vacate its ruling. CTE then filed a petition for certiorari with the United States Supreme Court. After the Court issued its decision in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 US ___, 131 S Ct 2780, 180 L Ed 2d 765 (2011), the Court granted CTE's petition for certiorari, vacated our order, and remanded the case to us for further consideration in light of *Nicastro*. *China Terminal & Elec. Corp. v. Willemsen*, ___ US ___, 132 S Ct 75, 181 L Ed 2d 1 (2011). On remand, we

---

[1] Defendant China Terminal & Electric Corp. is the former business name of CTE Tech Corp. We refer to both defendants as CTE.

1

issued an alternative writ of mandamus to the trial court directing it to vacate its order denying CTE's motion to dismiss or show cause for not doing so. The trial court declined to vacate its order, and the parties have briefed the question whether, in light of *Nicastro*, Oregon courts may exercise personal jurisdiction over CTE. We hold that they may and accordingly dismiss the alternative writ.

Plaintiffs are Oregon residents.[2] Their mother was an Oregon resident, who purchased a motorized wheelchair manufactured by Invacare. The wheelchair came with a battery charger manufactured by CTE.[3] On February 1, 2008, plaintiffs' mother died in her home as a result of a fire allegedly caused by a defect in CTE's battery charger. Plaintiffs brought this action against, among other defendants, Invacare and CTE. They alleged that the battery charger that CTE had manufactured and that Invacare had sold was a defective product. Alternatively, they alleged that CTE had been negligent in failing to "adequately design, inspect, test, [and] manufacture" the battery charger.

CTE moved to dismiss plaintiffs' claims against it for lack of personal

---

[2] This case arises on CTE's motion to dismiss for lack of personal jurisdiction. In considering the trial court's resolution of that issue, we take the facts from the allegations in plaintiffs' third amended complaint and the affidavits and other evidence that the parties have submitted. *See* ORCP 21 A (providing that, if a defendant moves to dismiss for lack of personal jurisdiction, a trial court is not limited to the pleadings but may consider "affidavits, declarations and other evidence" in "determin[ing] the existence or nonexistence of the facts supporting [that] defense"). We note that some of the facts necessary to determine personal jurisdiction over CTE are contained in documents filed under seal in the trial court. We also note that plaintiffs have discussed those facts, without objection, in their brief on the merits in this court. We discuss those same facts.

[3] The record is not clear whether the battery chargers are component parts of Invacare's motorized wheelchairs or sold together with the wheelchairs, in the same way that a battery charger might be sold with a cell phone.

2

jurisdiction. On that issue, the record shows that CTE is a Taiwanese corporation with its principal place of business in that country and that Invacare is an Ohio corporation with its principal place of business in that state. In 2004, CTE entered into a "master supply agreement" with Invacare to provide Invacare with battery chargers manufactured to Invacare's specifications.[4] CTE warranted that its battery chargers would be "manufactured, packaged, labeled and stored in accordance with all applicable federal, state and local laws, ordinances, rules and regulations * * *." CTE also agreed to certify annually that it had current certificates of insurance for "products and general liability coverage for bodily injury, personal injury and property damage in the amount of one million dollars ($1,000,000) per occurrence." Finally, CTE promised to defend, indemnify, and hold Invacare harmless for any "claims, losses, damages, charges, [and] expenses * * * which may be made against [Invacare] or which [Invacare] may incur arising out of or concerning the [battery chargers]." In connection with that promise, CTE agreed to cooperate with Invacare "in the investigation of any actual or threatened claim, loss, damage, charge or expense."

In 2006-07, Invacare sold 1,166 motorized wheelchairs in Oregon that Invacare made in Ohio.[5] Of those 1,166 wheelchairs, 1,102 wheelchairs came with

---

[4] Invacare provided 3, 5, and 8 amp CTE battery chargers to customers who bought its motorized wheelchairs. Although the master supply agreement concerns only 3 amp battery chargers, the parties treat the master supply agreement as if it applied to all three types of battery chargers, and so do we.

[5] It is unclear from the complaint whether Invacare itself sold its motorized wheelchairs in Oregon or whether it sold them through a distributor, United Seating & Mobility, LLC. (The complaint uses the phrase "sold and/or distributed.") As we

battery chargers that CTE had manufactured and sold to Invacare.[6] CTE received approximately $30,929 from Invacare for the battery chargers that Invacare provided to Oregon purchasers. Otherwise, CTE had no contacts with Oregon. As noted, CTE's principal place business is Taiwan. It does not maintain offices in Oregon and does not directly transact business here. It does not sell its products directly in Oregon, nor does it direct advertising material to customers in Oregon or directly solicit business here.

After considering the facts set out above, the trial court denied CTE's motion to dismiss for lack of personal jurisdiction. CTE filed a petition for a writ of mandamus with this court, which we denied. As noted, after the Court issued its decision in *Nicastro*, it granted CTE's petition for certiorari, vacated our order, and remanded the case to us for further consideration in light of *Nicastro*. On remand, the parties have briefed the question whether, in light of the decision in *Nicastro*, Oregon may assert personal jurisdiction over CTE. We turn to that question.

The dispute in this case is narrow. CTE does not contend that Oregon's long-arm statute does not reach its conduct. *Cf. North Pacific v. Guarisco*, 293 Or 341, 351-52, 356, 647 P2d 920 (1982) (holding that Oregon courts lacked personal jurisdiction over out-of-state defendants to adjudicate a cause of action that did not fall within the

_____

understand CTE's argument, it does not matter whether Invacare or United Seating sold Invacare's wheelchairs and CTE's battery chargers in Oregon. In CTE's view, the dispositive facts are that *it* did not sell its battery chargers directly in Oregon and that *it* did not otherwise have any direct contacts here. We accordingly refer to Invacare's "sale" of its wheelchairs and CTE battery chargers in Oregon.

[6] CTE supplied 100 percent of the 3 and 5 amp battery chargers that Invacare provided to customers in Oregon and 73 percent of the 8 amp battery chargers that Invacare provided to customers in Oregon.

4

reach of the then-applicable long-arm statute).  Rather, CTE recognizes that ORCP 4 L provides for personal jurisdiction over out-of-state defendants "in any action where prosecution of the action against [the] defendant in this state is not inconsistent with the Constitution of this state or the Constitution of the United States."  CTE argues, however, that the Due Process Clause does not permit Oregon to exercise personal jurisdiction over it when it has not purposefully availed itself of the privilege of conducting business in Oregon.

Plaintiffs, for their part, do not dispute that, under the Due Process Clause, a state may require an out-of-state defendant to appear in its courts only when the state has general or specific jurisdiction over that defendant.  *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 US ___, 131 S Ct 2846, 2851, 180 L Ed 2d 796 (2011) (discussing those bases for asserting personal jurisdiction over out-of-state defendants). Plaintiffs do not contend that Oregon has general jurisdiction over CTE; that is, plaintiffs do not contend that CTE's "affiliations with [Oregon] are so 'continuous and systematic' as to render [CTE] essentially at home in the forum State."  131 S Ct at 2851 (describing general jurisdiction); *cf. Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 US 408, 416-18, 104 S Ct 1868, 80 L Ed 2d 404 (1984) (explaining when an out-of-state corporation's "continuous and systematic general business contacts" within a state will give rise to general jurisdiction).

Plaintiffs rely instead on specific jurisdiction, which "depends on an affiliatio[n] between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's

5

regulation." *See Goodyear Dunlop Tires*, 131 S Ct at 2851 (explaining specific jurisdiction) (alteration in original; internal quotation marks omitted). "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* (internal quotation marks omitted). In this case, plaintiffs argue that the sale of Invacare wheelchairs and CTE battery chargers in Oregon provides sufficient minimum contacts with this state for Oregon courts to assert specific jurisdiction over CTE for injuries that its battery chargers allegedly caused here.

On that question, we note that, if CTE had sold its battery chargers directly in Oregon, there would be no dispute that Oregon could exercise personal jurisdiction over CTE for injuries that those chargers allegedly caused here. The issue in this case arises from the fact that CTE sold its battery chargers to Invacare in Ohio with the expectation that Invacare would sell its wheelchairs together with CTE's battery chargers nationwide. CTE contends that, because Invacare (and not CTE) is the one that targeted Oregon, CTE has not purposefully availed itself of the privilege of doing business in Oregon and, as a result, the Oregon courts may not assert jurisdiction over it. CTE reasons that, under *Nicastro,* the mere fact that it may have expected that its battery chargers might end up in Oregon is not sufficient to give Oregon courts specific jurisdiction over it.

As CTE notes, the issue that this case presents is similar to the issue in *Nicastro*. In that case, a British manufacturer sold its products (metal shearing machines used in the recycling industry) to an independent United States distributor, which

6

marketed them throughout the United States. *Nicastro*, 131 S Ct at 2786 (plurality opinion). The United States distributor sold one machine to a company in New Jersey. *Id.*[7] That machine allegedly malfunctioned and injured the plaintiff, who sued the British manufacturer in New Jersey. *Id.* In holding that the New Jersey courts could exercise personal jurisdiction over the British manufacturer, the New Jersey Supreme Court reasoned that the British manufacturer "knew or reasonably should have known 'that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states.'" *Id.* (quoting *Nicastro v. McIntyre Machinery America, Ltd.*, 987 A2d 575, 592 (NJ 2010)). That was enough, according to the New Jersey Supreme Court, to establish personal jurisdiction over the British manufacturer.

The Court allowed the British manufacturer's petition for certiorari and reversed the state court's judgment. *See Nicastro*, 131 S Ct at 2791 (plurality opinion); *id.* (Breyer, J., concurring in the judgment). The case did not produce a majority opinion for the Court. However, a majority of the members of the Court agreed that the fact that an out-of-state manufacturer sells its products through an independent nationwide distribution system is not sufficient, without more, for a state to assert personal jurisdiction over the manufacturer when only one of its products ends up in a state and causes injury there. *Id.* at 2791 (plurality opinion); *id.* at 2792 (Breyer, J., concurring in

---

[7] The plurality opinion noted that up to four machines may have reached New Jersey. *Nicastro*, 131 S Ct at 2786. Justice Breyer's opinion concurring in the judgment stated that only one machine had reached New Jersey. *Id.* at 2791. For the reasons explained below, Justice Breyer's opinion in *Nicastro* is controlling.

the judgment). Beyond that, the rationales advanced in the plurality opinion and the opinion concurring in the judgment differ.

Justice Kennedy, writing for the plurality, started from the premise that what matters for the purposes of determining a state court's authority over an out-of-state defendant "is the defendant's actions, not his expectations." *Id.* at 2789. In the plurality's view, the fact that it was foreseeable that a defendant's products might be distributed in one or all of the 50 states was not enough; rather, the plurality would require evidence that the out-of-state defendant had "targeted" the forum state in some way. *Id.* at 2788. As the plurality put it, the "question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *Id.* at 2789. Although there was evidence that the British manufacturer had targeted the United States, there was no evidence that it had targeted New Jersey specifically. *Id.* at 2790. For that reason, the plurality would have held that New Jersey lacked personal jurisdiction over the British manufacturer. *Id.* at 2790-91.

Justice Breyer, with whom Justice Alito joined, would have decided the case on a narrower ground. He reasoned that the Court's precedents stand for the proposition that "a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." *Id.* at 2792 (Breyer, J., concurring in the judgment). Because the evidence did not establish any connection between the British manufacturer and New Jersey other than

8

the single sale achieved as a result of the independent distributor's efforts, Justice Breyer agreed with the plurality that, under the Due Process Clause, the British manufacturer did not have sufficient contacts with New Jersey for the courts of that state to exercise personal jurisdiction over it. *Id.* at 2791-92.

Finally, Justice Ginsburg, with whom Justices Sotomayor and Kagan joined, dissented. Justice Ginsburg reasoned that, when the British manufacturer "dealt with the United States as a single market" and sought to have its products distributed throughout the nation, due process did not prevent the state where the injury had occurred from holding the manufacturer accountable. *Id.* at 2801 (Ginsburg, J., dissenting). In her view, the fact that only one of the British manufacturer's machines had been sold in New Jersey was no bar to exercising jurisdiction over the manufacturer, when that machine was the one that gave rise to the plaintiff's claim. *Id.* at 2804.

When, as in this case, "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgmen[t] on the narrowest grounds . . . ." *Marks v. United States*, 430 US 188, 193, 97 S Ct 990, 51 L Ed 2d 260 (1977) (internal quotation marks omitted) (ellipsis in original); *accord Panetti v. Quarterman*, 551 US 930, 949, 127 S Ct 2842, 168 L Ed 2d 662 (2007) (following *Marks*). Applying that rule, we look to Justice Breyer's opinion concurring in the judgment for the "holding" in *Nicastro* that guides our resolution of this case; that is, Justice Breyer's rationale was narrower than the plurality's and, as a result, controls our resolution of this case on remand. We accordingly discuss the rationale in Justice

9

Breyer's opinion in greater detail.

In explaining why the record was not sufficient to establish personal jurisdiction over the British manufacturer, Justice Breyer reasoned:

> "Here, the relevant facts found by the New Jersey Supreme Court show no 'regular . . . flow' or 'regular course' of sales in New Jersey; and there is no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else. Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey. He has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows [in other states at which the British Manufacturer had appeared and solicited sales]. And he has not otherwise shown that the British Manufacturer 'purposefully avail[ed] itself of the privilege of conducting activities' within New Jersey, or that it delivered its goods in the stream of commerce 'with the expectation that they will be purchased' by New Jersey users. *World-Wide Volkswagen* [*Corp. v. Woodson*, 444 US 286, 297-98, 100 S Ct 559, 62 L Ed 2d 490 (1980)]."

*Nicastro*, 131 S Ct at 2792 (Breyer, J., concurring in the judgment) (ellipsis and second alteration in original).[8] Without evidence of a "'regular. . . flow' or 'regular course' of sales" in New Jersey (or, in the absence of that evidence, evidence of "'something more,' such as special state-related design, advertising, advice, [or] marketing"), Justice Breyer concluded that the record in *Nicastro* was insufficient to establish personal jurisdiction over the out-of-state defendant. *Id.* (ellipsis in original).

Having reached that conclusion, Justice Breyer noted that he "d[id] not agree with the plurality's seemingly strict no-jurisdiction rule" or the "absolute approach

---

[8] The phrases "'regular . . . flow' or 'regular course' of sales" are taken respectively from Justice Brennan's and Justice Stevens' separate opinions in *Asahi Metal Industry Co. v. Superior Court of California*, 480 US 102, 117, 122, 107 S Ct 1026, 94 L Ed 2d 92 (1987). Justice Breyer previously had quoted those phrases in parentheticals describing Justice Brennan's and Justice Stevens' opinions in *Asahi*. *Nicastro*, 131 S Ct at 2792 (Breyer, J., concurring in the judgment).

adopted by the New Jersey Supreme Court" -- *i.e.*, that a state could assert jurisdiction over an out-of-state manufacturer as long as the manufacturer knows or should know that its products "'are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.'" *Id.* at 2793 (quoting the New Jersey Supreme Court's decision) (emphasis supplied by the opinion concurring in the judgment).

Justice Breyer explained that the New Jersey Supreme Court's rule was problematic for two reasons. First, it did not focus on the defendant's relationship with the forum, leading to the possibility that jurisdiction would rest "upon no more than the occurrence of a product-based accident in the forum State." *Id.* Second, New Jersey's rule would result in jurisdiction over all out-of-state manufacturers who distribute goods nationally without regard to the fairness of making them appear and defend. *Id.* at 2793-94. He explained that, although that rule might seem fair with regard to a large manufacturer that had the ability to appear and defend wherever its products caused injury (or to hedge against that possibility by buying insurance), New Jersey's rule did not seem as fair when applied to a small manufacturer selling its products through a national or international distributor. *Id.* Not only would it impose potentially undue burdens on small manufacturers selling only a few products in a state, but it also would require those manufacturers to anticipate and comply with the laws of the 50 states. *Id.* at 2794. For those reasons, Justice Breyer declined to follow either of the broad approaches advanced by the plurality or the New Jersey Supreme Court.

With that understanding of *Nicastro* in mind, we turn to the facts of this

11

case.[9] The trial court reasonably could have found that CTE understood that Invacare would sell its wheelchairs and CTE's battery chargers throughout the United States.[10] CTE agreed to manufacture the battery chargers to Invacare's specifications and in compliance with federal, state, and local requirements. To be sure, nationwide distribution of a foreign manufacturer's products is not sufficient to establish jurisdiction over the manufacturer when that effort results in only a single sale in the forum state. *See Nicastro*, 131 S Ct at 2791 (Breyer, J., concurring in the judgment). In this case, however, the record shows that, over a two-year period, Invacare sold 1,102 motorized wheelchairs with CTE battery chargers in Oregon. In our view, the sale of over 1,100 CTE battery chargers within Oregon over a two-year period shows a "'regular . . . flow' or 'regular course' of sales" in Oregon. *See id*. at 2972 (Breyer, J., concurring in the

---

[9] Plaintiffs argue that we should look to this court's decision in *State ex rel Hydraulic Servocontrols v. Dale*, 294 Or 381, 657 P2d 211 (1982), to determine whether Oregon courts may assert specific jurisdiction over CTE. This court decided *Hyrdaulic Servocontrols* shortly after the Court decided *World-Wide Volkswagen*. Since then, the Court has attempted to define, first in *Asahi* and more recently in *Nicastro*, when a state court may assert specific jurisdiction over an out-of-state manufacturer that sells its product to another company, which then sells or distributes the product nationwide. Not only do the terms of the Court's remand direct us to consider this case further in light of *Nicastro*, but we would be remiss if we did not look initially to the more recent decisions in *Nicastro* and *Asahi* for guidance in deciding CTE's due process claim. As explained below, we need look no further than *Nicastro* to conclude that Oregon courts may exercise specific jurisdiction over CTE.

[10] As noted, ORCP 21 A authorizes Oregon trial courts to consider "affidavits, declarations and other evidence" in "determin[ing] the existence or nonexistence of the facts supporting" the defense of a lack of personal jurisdiction. It thus authorizes a state trial court to determine the facts and draw reasonable inferences from undisputed facts in the course of deciding whether it has personal jurisdiction over an out-of-state defendant. As a matter of state law, when a trial court has engaged in that enterprise, we construe the facts and draw all reasonable inferences consistently with the trial court's ruling.

judgment) (ellipsis in original).[11] The sale of the CTE battery charger in Oregon that led to the death of plaintiffs' mother was not an isolated or fortuitous occurrence.

In arguing for a different conclusion, CTE relies primarily on the reasoning in the plurality opinion in *Nicastro*. If that opinion were controlling, it might be difficult for plaintiff to show that, on this record, CTE's contacts with Oregon were sufficient to establish jurisdiction over it. As explained above, however, the rule that the Court announced in *Marks* for construing splintered decisions leads us to conclude that the rationale expressed in Justice Breyer's opinion concurring in the judgment controls our resolution of this case. Following his opinion, we hold that the volume of sales in this case was sufficient to show a "regular course of sales" and thus establish sufficient minimum contacts for an Oregon court to exercise specific jurisdiction over CTE. *Cf. Nicastro*, 131 S Ct at 2792 (Breyer, J., concurring in the judgment) (internal quotation marks omitted).

CTE argues alternatively that "Invacare's sales figures in Oregon were a min[i]scule fraction -- both in sheer numbers, as well as the proportion of end product manufacturer's total sales in the forum -- compared to what the United States Supreme Court unanimously found to be insufficient in *Asahi* [*Metal Industry Co. v. Superior Court of California*, 480 US 102, 107 S Ct 1026, 94 L Ed 2d 92 (1987)]." We read both the holding and the record in *Asahi* differently. In that case, a Japanese manufacturer

---

[11] By contrast, over a 15-year period, only one British metal shearing machine was sold in New Jersey. *See Nicastro*, 987 A2d at 579 (noting that the British manufacturer's marketing efforts in the United States lasted from 1990 to 2005).

13

(Asahi) sold valve assemblies to a Chinese tire tube manufacturer (Cheng Shin), which incorporated both Asahi's valve assemblies and valve assemblies from other manufacturers into its tire tubes, which it sold worldwide. *Id.* at 106. Cheng Shin alleged that 20 percent of the tire tubes that it sold in the United States were sold in California. *Id.* Beyond that, the decision in *Asahi* does not identify the total number of Cheng Shin tire tubes sold in either the United States or California, nor does it identify either the number of Cheng Shin tire tubes sold in the United States or California that incorporated Asahi's valve assemblies. *See id.* Apparently, the only evidence in the record on that issue consisted of an "informal examination" of a single store in California, which revealed that Cheng Shin had manufactured 53 of the 115 tire tubes offered for sale in that store and that only 12 of the 53 Cheng Shin tire tubes contained Asahi valve assemblies. *Id.* at 107.

When one of Cheng Shin's tire tubes failed, the person injured as a result of that failure brought suit in a California state court against Cheng Shin, which filed an indemnification claim against Asahi. *Id.* at 105-06. All the parties settled except for Cheng Shin and Asahi, which defended against Cheng Shin's indemnification claim on the ground that the California state courts lacked personal jurisdiction over it. As we read the various opinions in *Asahi*, a majority of the Court did not agree whether the evidence of Cheng Shin's sales of tire tubes containing Asahi valves established sufficient minimum contacts between Asahi and California for California to assert jurisdiction over it.

Justice O'Connor, writing for four Justices in *Asahi*, would have required

14

evidence that Asahi purposefully had availed itself of the privilege of doing business in California; in her view, the fact that Asahi was "awar[e] that some of the valves sold to Cheng Shin would be incorporated into tire tubes sold in California" was not sufficient to satisfy due process. *Id.* at 112 (opinion of O'Connor, J.). Justice Brennan, writing for four Justices, would have held that the sale of Asahi's valve assemblies in California established a "regular and anticipated flow of products from manufacture to distribution to retail sale," which was sufficient to establish the minimum contacts with California necessary for that state to assert personal jurisdiction over Asahi. *Id.* at 117, 121 (Brennan, J., concurring in part and concurring in the judgment). Finally, Justice Stevens found it unnecessary to decide whether minimum contacts existed. *Id.* at 121 (Stevens, J., concurring in part and concurring in the judgment). He reasoned that, even if they did, "this case fits within the rule that 'minimum requirements inherent in the concept of "fair play and substantial justice" may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities.'" *Id.* at 121-22 (Stevens, J., concurring in part and concurring in the judgment) (quoting *Burger King Corp. v. Rudzewicz*, 471 US 462, 477-78, 105 S Ct 2174, 85 L Ed 2d 528 (1985)).

The Court agreed on only one point in *Asahi*. After Justice O'Connor expressed her view that Asahi's contacts with California were not sufficient to give the California courts jurisdiction over it, she reasoned alternatively that, even if those contacts were sufficient, exercising jurisdiction in the circumstances of that case would offend "traditional notions of fair play and substantial justice." *Id.* at 113 (internal quotation marks omitted). That part of her opinion rested primarily on the unique

15

circumstance that, after all the other parties had settled, the only issue left to be adjudicated in California was an indemnification claim by one foreign company against another involving a transaction (Asahi's sale of valve assemblies to Cheng Shin) that had no connection to either California or the United States. *Id.* at 114-15.

All the Court joined that part of Justice O'Connor's opinion. *See id.* at 116 (Brennan, J., concurring in part and concurring in the judgment); *id.* at 121 (Stevens, J., concurring in part and concurring in the judgment). As we read *Asahi,* its holding is limited to the alternative ground stated in Part II-B of Justice O'Connor's opinion; that is, the Court decided the case on an alternative ground that either assumed, in Justice O'Connor's opinion, or found, in Justice Brennan's opinion, sufficient minimum contacts.

Contrary to CTE's argument in this case, a unanimous Court did not find in *Asahi* that Asahi's contacts were not sufficient to establish personal jurisdiction over it.[12] Beyond that, we think that CTE misperceives the significance of the facts regarding the sales in *Asahi*. As CTE correctly notes, the decision recites that Asahi sold 100,000 to 500,000 valve assemblies to Cheng Shin annually. *See id.* at 106. However, the decision also explained that "Cheng Shin purchases valve assemblies from other suppliers as well, and sells finished tubes throughout the world." *Id.* As noted, the decision does not identify the annual sales figures in California (or the United States) of Cheng Shin's tubes

---

[12]    Not only would four Justices have found that Asahi's contacts were sufficient for California to exercise jurisdiction over it, *Asahi,* 480 US at 121 (Brennan, J., concurring in part and concurring in the judgment), but Justice Stevens observed that, if he were to reach the issue, he would be inclined to conclude that the evidence was sufficient, *id.* at 122 (Stevens, J., concurring in part and concurring in the judgment).

containing Asahi's valve assemblies. It does not even identify how many tire tubes Cheng Shin sold annually in California (or the United States), with or without Asahi's valve assemblies. *See id.* at 106-07. Without that information, it is difficult to make much of the annual sales from Asahi to Cheng Shin, not only because Asahi was not the only manufacturer that supplied valve assemblies to Cheng Shin but also because Cheng Shin sold its tire tubes throughout the world and could have sold its tire tubes with Asahi valves primarily in countries other than the United States. *Cf. Goodyear Dunlop Tires*, 131 S Ct at 2852 (noting that Goodyear's European subsidiaries marketed their tires for use primarily in European countries and that only a small percentage of those tires reached the forum state).

In our view, the decision in *Asahi* provides little assistance to CTE. However, to the extent that the annual number of battery chargers that CTE sold to Invacare matters, we note that the trial court reasonably could have found that, in 2006-07, CTE sold roughly 76,000 battery chargers to Invacare in Ohio, which Invacare then sold with its wheelchairs throughout the United States.[13] In any event, in 2006-07, 1,102 Invacare wheelchairs equipped with CTE battery chargers were sold in Oregon. CTE has provided no valid reason to say that the sale of 1,102 CTE battery chargers in Oregon

---

[13] We say "roughly" because the record is not precise. It discloses only the "total accounts payable" from Invacare's manufacturing facility in Ohio to CTE. Using the figures that CTE's representative used to determine the weighted average cost of the battery chargers that Invacare sold in Oregon and the "total accounts payable" to CTE, the trial court could have found that the total sales from CTE to Invacare exceeded 76,000. We note that that calculation assumes that the weighted average cost was the same both in Oregon and nationally. It also assumes that the total amount payable to CTE reflected only the cost of battery chargers that CTE had sold to Invacare.

17

over a two-year period does not constitute a "regular course of sales" in this state. *See Nicastro*, 131 S Ct at 2792 (Breyer, J., concurring in the judgment) (internal quotation marks omitted). Put differently, the pattern of sales of CTE's battery chargers in Oregon establishes a "relationship between 'the defendant, the *forum*, and the litigation,' [such that] it is fair, in light of the defendant's contacts *with* [*this*] *forum*, to subject the defendant to suit [h]ere.'" *Id.* (Breyer, J., concurring in the judgment) (quoting *Shaffer v. Heitner*, 433 US 186, 204, 97 S Ct 2569, 53 L Ed 2d 683 (1977) (emphasis added by the opinion concurring in the judgment).

One other issue remains. As *Asahi* makes clear, even if the sale of CTE's battery chargers in Oregon provides sufficient minimum contacts for Oregon courts to assert personal jurisdiction over CTE, the remaining question is whether exercising jurisdiction would "offend traditional notions of fair play and substantial justice" and thus be inconsistent with due process. *See Asahi*, 480 US at 113 (internal quotation marks omitted). On that issue, we note that this is not a case, as in *Asahi*, where the only question that remains to be adjudicated is a claim for indemnification between two out-of-state defendants. Rather, in this case, Oregon residents seek to vindicate their claims for the death of their mother in the state where the death occurred, allegedly as a result of a defect in CTE's battery charger. Oregon has a strong interest in providing a forum for its residents who are injured in this state to recover for their injuries. *Cf. Asahi*, 480 US at 114-16 (noting that the calculus would be different if California had an interest in determining the plaintiff's claim).

Moreover, this case does not raise the concerns about exercising

18

jurisdiction over small manufacturers that distribute only a few products in a state as a result of a national distribution system, which Justice Breyer noted in *Nicastro*. *See* 131 S Ct at 2794 (Breyer, J., concurring in the judgment). As an initial matter, the trial court reasonably could have found that CTE is not a small manufacturer. Rather, over a two-year period, CTE's revenues (or at least the amounts payable) from Invacare alone exceeded $2,150,000. As noted, the trial court also reasonably could have found that, over that period, Invacare purchased approximately 76,000 battery chargers from CTE for distribution in this country. Additionally, in the master supply agreement between CTE and Invacare, CTE promised that its battery chargers would comply with all federal, state, and local laws. CTE thus voluntarily undertook to bring its battery chargers into compliance with the laws of the various states in which Invacare sold them. Finally, as part of the master supply agreement, CTE agreed that it would "continuously have on file with [Invacare] a current Certificate of Insurance showing evidence of products and general liability coverage for bodily injury, personal injury and property damage in the amount of one million dollars ($1,000,000) per occurrence." In selling its battery chargers to Invacare, CTE anticipated the need to defend against the very sort of claim that plaintiffs have brought here, and it agreed to obtain insurance as a hedge against the cost of doing so.

Requiring CTE to appear in Oregon does not offend traditional notions of fair play and substantial justice and thus does not preclude the trial court from exercising jurisdiction over CTE as a result of its contacts with this forum. The trial court could, consistently with due process, require CTE to appear in an Oregon court and respond to

19

plaintiffs' claims that a defect in its battery charger caused their mother's death.

The alternative writ of mandamus is dismissed.