IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Emergency Communications Tax

| | | |
|---|---|---|
| OOMA, INC., a foreign corporation, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 160375G |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

On cross-motions for summary judgment, this case concerns whether an out-of-state

telecommunications provider without a physical presence in Oregon must collect Oregon's

emergency communications tax (9-1-1 tax) from its subscribers.  Plaintiff (Ooma) appealed from

Defendant's (the department's) Notices of Assessment for the quarters ending March 2013 to

March 2016.

## I.  STATEMENT OF FACTS

Ooma is a foreign corporation (subchapter C) with its principal place of business in Palo

Alto, California.  (Stip Facts ¶¶ 1,5.)  Ooma did not file 9-1-1 tax returns with the department

during the periods at issue.  (*Id.* ¶ 4.)

Ooma provides voice-over-internet-protocol (VoIP) services to customers across the

United States, including residents of Oregon.  (Stip Facts ¶ 7.)  VoIP technology enables

customers to conduct voice communications via a high-speed (broadband) internet connection.

(*Id.*)  Ooma also provides additional telecommunications services to residents of Oregon that

include voicemail, call waiting, call forwarding and caller identification.  (*Id.* ¶ 8.)  Oregon

---

[1] In response to a request filed by the department, this Final Decision modifies section II-C of the court's Decision, entered March 27, 2018.  Neither party requested an award of costs and disbursements.

residents purchase the broadband connections necessary to receive Ooma's services from unaffiliated independent third parties. (*Id. ¶* 9.)

To access the VoIP services provided by Ooma, an Oregon resident must first purchase one of two Ooma VoIP devices known as "Ooma Telo" or "Ooma Office." (Stip Facts ¶ 11.) The Telo and Office devices can be purchased from independent retail stores, directly from Ooma via Ooma's website, and from several independent online retailers. (*Id.*) Ooma sold the equipment needed to access its VoIP services to independent third-party retailers with locations in Oregon for resale to Oregon residents. (*Id. ¶* 16.)

Once an Oregon resident has the equipment necessary to access Ooma's services, calls are transmitted along one of two different paths. (Stip Facts ¶ 12.) Calls between Ooma customers are transmitted via broadband directly from one Ooma device to the other. (*Id. ¶* 13.) If the call recipient is not an Ooma customer, the digital data sent from the call initiator is processed through one of several regional data centers. (*Id. ¶* 14.) Those digital data centers convert the digital data into an analog audio signal, which is then directed to the Public Switched Telephone Network (PSTN). (*Id.*) Such digital data centers and the telecommunications lines and other equipment relevant to the transmission of calls on the PSTN are owned and operated by unrelated third parties. (*Id.*)

For purposes of the parties' motions, the department did not dispute the following assertions of Ooma with respect to the periods at issue. (Stip Facts ¶ 19.)

a. None of Ooma's employees visited the State of Oregon;

b. Ooma did not hire or compensate independent sales representatives, agents or anyone of similar role or function to act on its behalf in Oregon to promote, advertise, solicit, or sell its VoIP services to Oregon residents;

c. Ooma did not hire or compensate independent third parties, agents or anyone of similar role or function to act on its behalf in the State of Oregon to pursue an

action to enforce or defend rights regarding tangible or intangible property or contractual rights;

d. Ooma did not participate in any court proceeding, mediation or arbitration in Oregon;

e. Ooma did not participate in any legal or collection action in the State of Oregon;

f. Ooma did not possess any license, permit, registration, or authorization issued by any entity, government, or organization in the State of Oregon;

g. Ooma did not communicate with any entity, government or organization in Oregon regarding whether any license, permit, registration, or authorization was required relating to the provision of Ooma's VoIP services to Oregon residents;

h. Ooma made no direct or indirect representation that it would pay or had paid Oregon taxes on VoIP services sold to Oregon residents; and

i. Ooma owned no real or tangible personal property in Oregon.

Ooma prepared marketing plans and employed business strategies that targeted customers nationwide, including Oregon residents. (Stip Facts ¶¶ 21, 22.) Ooma provided promotional and marketing materials to select national retailers for use in their retail locations, including retail locations in Oregon. (*Id.* ¶ 23.) In those instances, the retailer decided where and when to use Ooma's promotional and marketing materials. (*Id.*) On certain occasions, at the direction of a national retailer, Ooma shipped promotional and marketing materials to the retailer's location or locations in the State of Oregon. (*Id.* ¶ 24.)

The parties' stipulated exhibits include a list Ooma's equipment sales in Oregon during the periods at issue; two versions of a standard form contract ("Terms and Conditions") used by Ooma with its VoIP customers nationwide, including in Oregon; and totals of Ooma's Oregon revenues from recurring billings and product sales during the periods at issue. (Stip Facts, Exs B, C, E.) The parties also stipulated to a chart showing the amount of tax Ooma would owe if it were subject to the 9-1-1 tax: $299,175.75 over the periods at issue, not including penalties and

interest. (*Id. ¶* 26, Ex D.) Details from the stipulated exhibits are introduced where pertinent in the analysis below.

## II. ANALYSIS

The issue is whether the United States Constitution prohibits Oregon from requiring Ooma to collect, report, and remit the 9-1-1 tax during the periods at issue. Oregon imposes a tax of 75 cents per month on telecommunications service subscribers with access to the emergency communications system—the 9-1-1 tax.[2] ORS 403.200. Although the subscriber is liable, the service provider must collect the tax and file a return with the department each quarter. ORS 403.200(2),(3); 403.215. Ooma contends that requiring it to collect and remit the 9-1-1 tax violates the Due Process Clause of the Fourteenth Amendment and the Commerce Clause of the United States Constitution.

A.      *Due Process Clause*

"The Due Process Clause requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax, and that the income attributed to the State for tax purposes must be rationally related to values connected with the taxing State[.]" *Quill Corp. v. N. Dakota By & Through Heitkamp*, 504 US 298, 306, 112 S Ct 1904, 119 L Ed 2d 91 (1992) (citations and internal quotation marks omitted). The United States Supreme Court has often identified "notice" or "fair warning" that an individual might be subject to the power of the state as the "analytic touchstone of due process nexus analysis." *Id.* at 312. "[T]his 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum." *Burger King Corp. v. Rudzewicz*, 471 US 462, 472, 105 S

---

[2] ORS 403.200 was changed several times during the periods at issue, including the insertion of an express reference to "Voice over Internet Protocol service." *See* Or Laws 2014 ch 59, § 3a (2014). Neither party has argued that those changes are material to the outcome of this case.

Ct 2174, 85 L Ed 2d 528 (1985) (holding court's exercise of jurisdiction over lawsuit against out-of-state company did not violate the Due Process Clause).

A taxpayer need not be physically present in a state to have due process nexus with that state. *See Quill*, 504 US at 298 (overruling cases requiring physical presence for the imposition of duty to collect use tax); *Am. Refrigerator Transit Co. v. State Tax Comm'n*, 238 Or 340, 347, 395 P2d 127, 131 (1964) ("Nexus may be found even where neither property nor personnel of the taxpayer is employed within the taxing state if it can be said that the state substantially contributes to the production of the taxpayer's income."). A taxpayer engaging in "continuous and widespread solicitation of business within a State" has the "fair warning" required by the Due Process clause. *Quill*, 504 US at 308. When a company makes "regular monthly sales" of tangible personal property to a state's residents, that company's engagement with the state "cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 US 770, 774, 104 S Ct 1473, 79 L Ed 2d 790 (1984).

Here, Ooma's activities with respect to Oregon are evidence that it purposely solicited sales from Oregon residents. Ooma entered into thousands of contracts with Oregon residents to provide VoIP services. Ooma's lines in service grew from 6,663 to 13,467 during the periods at issue, and its monthly billings grew from approximately $34,000 in January 2013 to approximately $97,000 in March 2016. (Def's Mot at 3–4.) Further, Ooma sold more than 2,000 devices to Oregon retailers and directly to Oregon residents. (Stip Facts, Ex B.) By the department's calculations, those sales averaged approximately $16,000 per month. (Def's Mot at 7.)

Ooma argues that its activities were not purposefully directed toward Oregon residents because Oregon residents were not specifically targeted, but were merely swept up in its national

marketing strategy. Ooma would hold that the Due Process clause requires that companies have state-specific business plans before becoming subject to state tax. Its argument appears to be based on the plurality opinion in *J. McIntyre Machinery, Ltd. v. Nicastro* (*Nicastro*), 564 US 873, 131 S Ct 2780, 2783, 180 L Ed 2d 765 (2011). In *Nicastro*, four justices endorsed a "forum-by-forum, or sovereign-by-sovereign, analysis" to show that a party has "targeted the forum" before an exercise of jurisdiction over that party is proper. *Id.* at 884; *but see Willemsen v. Invacare Corp.*, 352 Or 191, 200–02, 282 P3d 867, 875 (2012) (concluding that Justice Breyer's concurrence, not the plurality opinion, was controlling).

The facts of this case differ significantly from those in *Nicastro* and other products liability cases examining the so-called "stream-of-commerce doctrine." *See* 564 US at 877–78 (lawsuit in New Jersey court against foreign manufacturer of injurious machinery distributed by independent third party); *Willemsen*, 352 Or at 200–03 (lawsuit in Oregon court against foreign manufacturer of allegedly defective battery charger sold by third-party distributor). In those cases, the "stream of commerce" served as a metaphor for an independent national or international distribution system. The seller purposefully placed its goods into the "stream" by selling them to a distributor but, having done so, lost control over where the "stream" ultimately carried them—to the goods' final owners or users. The *Willemsen* court noted that "if [the battery manufacturer] had sold its battery chargers directly in Oregon, there would be no dispute that Oregon could exercise personal jurisdiction." *Willemsen*, 353 Or at 198.

Here, while Ooma's shipments to independent retailers might be characterized as having entered the "stream of commerce," those shipments do not represent the extent of Ooma's business with Oregon residents. Ooma sold its goods directly to Oregon residents and provided VoIP services to Oregon residents. And nothing in the record suggests that was unintentional.

Ooma engaged in a national marketing strategy, and such a strategy necessarily targets the residents of the various states. Ooma's activity in Oregon was no less purposeful because it engaged in similar activity elsewhere.

Ooma's numerous direct contacts with Oregon customers distinguish this case from *Scioto Insurance Company v. Oklahoma Tax Commission*, 2012 OK 41, 279 P3d 782 (2012), and *Griffith v. ConAgra Brands, Inc.*, 229 W Va 190, 728 SE2d 74 (2012), both cited by Ooma. Those cases involved entities that licensed intellectual property to related and unrelated third parties. In each case, the taxpayer–licensor had no direct contacts with the taxing state but received royalties from the activities of licensees (or sublicensees) within the taxing state. *See Scioto*, 279 P3d at 783; *ConAgra*, 728 SE2d 76. That is not the case here. Ooma received revenue directly from Oregon customers for goods and services it sold in Oregon. *Scioto* and *ConAgra* are therefore inapposite.

Considering Ooma's regular sales of telecommunications devices and services to Oregon customers, the Due Process clause does not prevent Oregon from requiring Ooma to collect the 9-1-1 tax.

B.      *Commerce Clause*

The U.S. Supreme Court has announced a four-part test to determine whether a tax runs afoul of the "negative sweep" of the Commerce Clause (*i.e.* the "dormant" Commerce Clause). *See Quill*, 504 US at 309; *Complete Auto Transit, Inc. v. Brady*, 430 US 274, 279, 97 S Ct 1076, 51 L Ed 2d 326 (1977) (describing four-part test). Under *Complete Auto*'s four-part test, a tax will be upheld if it "[1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." *Complete Auto*, 430 US at 279.

Ooma argues under the first prong of the *Complete Auto* test that it does not a have a substantial nexus with Oregon and under the fourth prong that the 9-1-1 tax is not fairly related to services provided by Oregon. The court will address each argument in turn.

1.      *Substantial Nexus*

Ooma contends the court should apply the bright-line, physical-presence rule announced in *Quill* to the 9-1-1 tax here. The United States Supreme Court held in *Quill* that "physical presence" in a state is required to establish a substantial nexus under the Commerce Clause where a duty to collect a sales or use tax is at issue. *Quill*, 504 US at 317–19; *see also Capital One Auto Finance Inc. v. Dept. of Rev*, 22 OTR 326, 338 (2016) (describing *Quill*). The physical-presence rule was first announced in an earlier case, *National Bellas Hess, Inc. v. Department of Revenue of State of Illinois*, 386 US 753, 87 S Ct 1389, 18 L Ed 2d 505 (1967). The *Quill* Court upheld the physical-presence rule (under the Commerce Clause) because of the "continuing value of a bright-line rule in this area and the doctrine and principles of *stare decisis*." [3] 504 US at 317.

Ooma offers two alternative theories in favor of applying *Quill*'s physical-presence rule. The first is that *Quill* is controlling because the 9-1-1 tax is a sales tax. The second is that the 9-1-1 tax mimics a sales tax, even if it is not actually a sales tax, and thus the reasoning of *Quill* requires extending its holding here.

The issue first at hand is whether the 9-1-1 tax is the type of tax controlled by *Quill*. The tax at issue in *Quill* was a "use tax upon property purchased for storage, use, or consumption" within North Dakota, set at a percentage of retailers' gross receipts. 504 US at 302; *Heitkamp v. Quill*, 470 NW2d 203, 205 (1991) (citing statute); *see* 1991 ND Laws Ch 676 (HB 1325)

---

[3] The Court overruled the *Bellas Hess* holding that the Due Process Clause also required physical presence before a duty to collect a sales and use tax could be imposed. *Quill*, 504 US at 308.

(reenacting five percent tax on retailers' gross receipts while amending another subsection of statute).[4] The tax's base included receipts from the provision of "communication services." *See* 1991 ND Laws Ch 676 (HB 1325). Thus, the general scope of the *Quill* tax applied to services as well as tangible goods, and was measured by the sales price of the goods or services. In that respect, it corresponded to the definition of a general retail sales tax proffered by a leading treatise on state taxation—it was a tax "imposed upon the retail 'sale' of tangible personal property or services, and * * * measured by the sales price of the goods or services." Jerome R. Hellerstein & Walter Hellerstein, 2 *State Taxation* ¶ 12.01[2][f][ii], 12–5 (3d ed 2000 & 2015 Supp).[5]

Although the 9-1-1 tax is collected by telecommunications providers from their customers in a manner similar to a sales tax, it differs from the *Quill* tax in at least two ways. First, the 9-1-1 tax is not measured by sales price. Instead, it is a fixed charge regardless of the price of the telecommunication service. Second, the 9-1-1 tax is not a sales or use tax in form. It is not imposed on the purchase or sale of telecommunication services, but rather on those who have access to the emergency communications system through such services. Those differences distinguish the 9-1-1 tax from a general retail sales tax and from the tax before the Court in *Quill*.

/ / /

---

[4] The statute, NDCC section 57–39.2–02.1, was cited as current in the North Dakota Supreme Court's 1991 decision.

[5] Hellerstein illustrates the breadth of the term *sales tax* by quoting definitions from other authorities in an introductory paragraph. *See* Jerome R. Hellerstein & Walter Hellerstein, 2 *State Taxation* ¶ 12.01[2][f][ii], 12-2–12-3 (3d ed 2000 & 2015 Supp). Ooma quotes one such definition: "a tax for which the amount of tax payable is produced by a constant rate applied to the volume or value of commodities or services transferred or exchanged." *Id*. (quoting N. Jacoby, Retail Sales Taxation 8 (1938).) The department's reply notes that among the broad array of *sales tax* definitions provided by Hellerstein are some that clearly would not include the 9-1-1 tax—such as tax on "all business sales of tangible personal property at either the retailing, wholesaling, or manufacturing stage[.]" *Id*. (quoting R. Haig & C. Shoup, The Sales Tax in the American States 3 (1934).) For their part, the authors of the treatise identify the "most significant form of sales taxation in the United States" as the "general retail sales tax."

The next question is whether the 9-1-1 tax mimics a sales tax in such a way that the physical-presence rule in *Quill* applies. The Regular Division analyzed such a claim in *Capital One*, 22 OTR at 326. In *Capital One*, the taxpayer argued that two of its subsidiary banks were not subject to Oregon income or excise tax. The banks had no employees or real or personal property in Oregon, although they had a substantial number of customers in Oregon and significant revenues from Oregon. Relying on *Quill*, the taxpayer argued that the banks did not have substantial nexus with Oregon because they lacked a physical presence in Oregon. Addressing that argument, the court observed that "nothing in *Quill* imposes a physical presence standard for Commerce Clause nexus outside the realm of collection obligations for sales or use taxes." *Capital One*, 22 OTR at 338. The court in *Capital One* identified "two bases" for the holding in *Quill*: (1) "imposing sales or use taxes on out-of-state taxpayers with no physical presence in the state creates an undue burden" on interstate commerce; and (2) the "settled expectations with respect to a physical presence standard in the realm of sales or use taxes." *Id.* Because neither of those concerns were present in *Capital One*, the court concluded that "neither of these bases require or even suggest that courts should adopt a physical presence requirement for taxes imposed upon or measured by net income." *Id.* at 344.

Ooma relies on the court's analysis in *Capital One* but distinguishes the facts of this case to argue that *Quill*'s physical-presence test should be extended to the 9-1-1 tax. Ooma argues that the 9-1-1 tax imposes an "undue burden" on interstate commerce and that "settled expectations" support the adoption of a physical-presence rule for the 9-1-1 tax. The court addresses those arguments in turn.

/ / /

/ / /

a.    Undue burden

In *Quill*, the Court explained that substantial nexus and "fairly related" prongs of the *Complete Auto* test "ensure that state taxation does not unduly burden interstate commerce." *Quill*, 504 US at 313.  In both *Bellas Hess* and *Quill*, the court took note that "many variations in rates of tax, in allowable exemptions, and in administrative and record-keeping requirements" across thousands of jurisdictions "could entangle a mail-order house in a virtual welter of complicated obligations."  *Id.* at 313 n 6 (quoting *Bellas Hess*, 368 US at 759–60) (brackets and internal quotation marks omitted).  A bright-line, physical-presence rule limits burdens on interstate commerce "by the demarcation of a discrete realm of commercial activity that is free from interstate taxation."  *Quill*, 504 US at 315.

Ooma argues that "innumerable" taxes in jurisdictions across the United States create a similar "welter of complicated obligations" that unduly burdens the telecommunications industry.  Ooma cites one study finding that "[t]elecommunications providers must file 47,921 returns compared to 7,501 returns for general businesses."  *2004 Telecommunications Tax Study*, Council on State Taxation 4 (2005).  However, that study lumps all taxes together—including emergency communications taxes, sales and use taxes, and myriad others.  The question is whether emergency communications taxes such as Oregon's 9-1-1 tax create an undue burden on interstate commerce.  That question cannot be answered by reference to all of the various taxes levied upon Ooma's industry.

The 9-1-1 tax is a statewide, fixed charge on each VoIP line with access to Oregon's emergency communications system, collected monthly and paid to Oregon on a quarterly basis.  For the sake of argument, if each state and territory adopted an emergency communications tax like Oregon's, then telecommunications providers would be subject to a few dozen such taxes

nationally.[6] Certainly, collecting 9-1-1 taxes imposes costs on telecommunications companies, and the fact that some such taxes are collected locally adds to that burden. However, Ooma has not shown that Oregon's 9-1-1 tax, or emergency communications taxes generally, create a "welter of complicated obligations" similar to sales and use taxes at the time *Bellas Hess* and *Quill* were decided.

Ooma correctly notes that the 9-1-1 tax shares some characteristics with sales and use taxes and is thus distinguishable from the income and excise taxes at issue in *Capital One*. In particular, service providers are required to collect the tax from their customers and therefore must determine beforehand what their tax obligations are. The court in *Capital One* observed that the obligation of a taxpayer to collect taxes from its customers is a "burden" that "looms large" in the sales and use tax context. *Capital One*, 22 OTR at 339. That is because the "taxpayer must ensure that the appropriate amount (and not more or less) is collected from the customer and directed to the appropriate taxing authority within the appropriate time"— determinations the taxpayer must make before it makes any sales in a jurisdiction. *Id.* Accordingly, a requirement to collect and remit a sales and use tax can become an undue burden "if the seller does not reasonably know whether it will have substantial nexus with the taxing state, or has minimal sales in a number of taxing jurisdictions." *Id.*

An evaluation of the burden placed on telecommunications providers by Oregon's 9-1-1 tax must consider the obligations already undertaken by telecommunications providers compliant with federal regulations. The FCC requires that interconnected VoIP service providers such as Ooma be capable of providing their customers with access to local emergency communications

---

[6] According to a recent FCC study cited by the department, 27 states collected 9-1-1 fees at the state level, six states did so locally, and 13 states collected fees at both the state and local level.

systems. *See* 47 CFR § 9.5.[7] To comply with those regulations and identify the "local emergency authority," a VoIP provider must obtain the physical address of each of its customers—the customer's "Registered Location"— before providing VoIP service. 47 CFR § 9.7(d)(1). Ooma's "Terms and Conditions" show that it does in fact take steps to "validate" its customers' addresses and that it requires its customers to keep their addresses up to date. (*See* Stip Facts, Ex C at 7, 16.)

Those federal regulations highlight the difference between Ooma and a "mail-order house." Whereas an interstate retailer may learn the tax laws of distant jurisdictions only after customers place their orders from there, Ooma must become familiar with local laws regarding emergency communications before providing any service in a location. While some additional cost is imposed on Ooma to also determine its tax burden in a given jurisdiction before finalizing a sale there, the element of surprise found in the case of the mail-order house receiving an order from an unknown jurisdiction is lacking. Furthermore, as a fixed charge the 9-1-1 tax is administratively simple to calculate: 75 cents per line per month. A computer could do it, and indeed, Ooma's "Terms and Conditions" invites prospective customers to determine the specific state and local taxes for their areas in advance by visiting Ooma's web site. (*See* Stip Facts, Ex C at 13.) The 9-1-1 tax does not unduly burden interstate commerce.

      b.     Settled Expectations

Ooma argues that here, as in *Quill*, "settled expectations" militate in favor of establishing a bright-line, physical-presence rule for 9-1-1 taxes. This court noted in *Capital One* that the

---

[7] Specifically, a VoIP provider must be able to transmit "all 9-1-1 calls * * * and the caller's Registered Location for each call to the PSAP [Public Safety Answering Point], designated statewide default answering point, or appropriate local emergency authority that serves the caller's Registered Location." 47 CFR § 9.5(b)(2). It follows that once a provider determines its customer's Registered Location, it must also be capable of determining the correct PSAP "designated statewide default answering point, or appropriate local emergency authority" that serves that location. *See id.*

*Quill* Court had separated its settled-expectations rationale into two strands. "First, the Court considered the benefit of the 'settled expectations' of taxpayers that result from a bright-line rule." *Capital One*, 22 OTR at 340. "Second, the Court considered the 'settled expectations' resulting from the doctrine of *stare decisis*, noting that the physical presence rule in *Bellas Hess* had 'engendered substantial reliance and has become part of the basic framework of a sizable industry.' " *Id.* (quoting *Quill* 504 US at 317.)

Regarding the first strand, Ooma argues that a bright-line, physical-presence rule would benefit its "fledgling" industry by providing certainty. However, as the department rightly points out, the decision whether to fashion tax rules supporting the " 'fledgling industry' *du jour*" is for the legislature to make, not this court. Indeed, although a bright-line, physical-presence rule may offer beneficial clarity, the Court has not extended it to other areas of taxation beyond sales and use taxes. *See Quill*, 504 US at 314, 317. The court declines to adopt a new rule on that basis.

Neither does the doctrine of *stare decisis* support Ooma's claim. The 9-1-1 tax is not a sales or use tax, and Ooma has not identified any case that extends the holding in *Quill* to similar taxes. To the contrary, other courts have declined to endorse a physical-presence requirement in this area. *See Vonage Am., Inc. v. City of Seattle*, 152 Wash App 12, 27, 216 P3d 1029 (2009); *Mayor & City Council of Baltimore v. Vonage Am. Inc.,* 569 F Supp 2d 535, 539 (D Md 2008). This court has explained that "nothing in *Quill* imposes a physical presence standard for Commerce Clause nexus outside the realm of collection obligations for sales or use taxes." *Capital One*, 22 OTR at 338. Because the 9-1-1 tax is not a sales or use tax, the application of *stare decisis* does not call for a physical-presence rule here.

/ / /

/ / /

2.      *Fairly Related*

Under the fourth prong of the *Complete Auto* test, nexus with out-of-state taxpayers requires that a tax be "fairly related to the services provided by the State." 430 US at 279. Under that test, "the *measure* of the tax must be reasonably related to the extent of the contact, since it is the activities or presence of the taxpayer in the State that may properly be made to bear a just share of state tax burden." *Commonwealth Edison Co. v. Montana*, 453 US 609, 626, 101 S Ct 2946, 69 L Ed 2d 884 (1981) (emphasis in original; internal quotation marks omitted). "The purpose of this test is to ensure that a State's tax burden is not placed upon persons who do not benefit from services provided by the State." *Goldberg v. Sweet*, 488 US 252, 266–67, 109 S Ct 582, 102 L Ed 2d 607 (1989).

There is some question as to whether the fourth prong of *Complete Auto* is the appropriate standard here. The U.S. Supreme Court distinguishes general revenue taxes from "user fees," the latter being fees designed as reimbursement for state-provided benefits like the use of airports and roads. *Commonwealth Edison*, 453 US at 621 (internal quotation marks omitted). A footnote in *Commonwealth Edison* states that user fees are not reviewed under the same standard as taxes and require a showing that "the fees charged do not appear to be manifestly disproportionate to the services rendered[.]" *Id.* at 622 n 12 (quoting *Clark v. Paul Gray, Inc.*, 306 US 583, 599, 59 S Ct 744, 83 L Ed 1001 (1939)); *see also Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc.*, 405 US 707, 716, 92 S Ct 1349, 31 L Ed 2d 620 (1972) (stating test is whether tax amount is "in excess of fair compensation for the privilege" of using state resources); *but see Am. Trucking Associations, Inc. v. Michigan Pub. Serv. Comm'n*, 545 US 429, 438, 125 S Ct 2419, 162 L Ed 2d 407 (2005) (favorably citing *Complete Auto* to uphold flat fee highway tax). Ooma contends that the 9-1-1 tax is a user fee

and must withstand the "more difficult test" stated in the footnote of *Commonwealth Edison* and applied in *Evansville-Vanderburgh*.

In *American Trucking Associations, Inc. v. State of Oregon*, 339 Or 554, 563-67, 124 P3d 1210 (2005), the Oregon Supreme Court concluded that the *Complete Auto* test—and not the *Evansville-Vanderburgh* test—was appropriate for analyzing a "flat-fee" highway tax. The tax at it issue in *American Trucking* was a fixed charge for use of Oregon's highways that certain carriers might choose to pay in lieu of a weight-mile tax. 339 Or at 559. The Oregon Supreme Court based its conclusion in part on the U.S. Supreme Court's favorable citation of *Complete Auto* in the same plaintiff's suit against Michigan. *Id*. at 567; *Am. Trucking Associations*, 545 US at 438.

The 9-1-1 tax at issue here resembles the flat-fee highway tax in *American Trucking*. Telecommunications subscribers pay a fixed charge for access to emergency communications services, just as carriers may pay a fixed charge for access to highways. In one way the 9-1-1 tax is even less like a user fee than the highway tax: carriers only pay the highway tax if they will actually use the highways in a given year, whereas telecommunications subscribers must pay the 9-1-1 tax even though most of them will not dial 9-1-1 in a given month. Therefore, *Complete Auto*, as interpreted by the Court in *Commonwealth Edison*, supplies the appropriate standard.

The 9-1-1 tax is fairly related to the emergency communications services provided, and the measure of the tax corresponds to Ooma's activities in Oregon, because Ooma benefits from "the privileges of * * * an organized society" in Oregon, with a marketplace that provides Ooma with thousands of customers. *See Commonwealth Edison*, 453 US at 629. However, Ooma receives services from Oregon that go beyond staving off anarchy. The 9-1-1 tax funds access to a local emergency communications system that Ooma is required by the federal government to

provide to its customers. *See* 47 CFR § 9.5. Access to such a system is part of the service Ooma provides its customers, and is therefore a reason for Ooma's customers to purchase its services. It is a benefit Ooma receives from the state of Oregon. *See Goldberg,* 488 US at 266–67. Finally, the measure of the 9-1-1 tax corresponds exactly with Ooma's Oregon activities: Ooma's collection obligation rises or falls with the number of VoIP lines it provides to its Oregon customers. The 9-1-1 tax satisfies the fourth prong of the *Complete Auto* test.

C.     *ORS 305.575*

This court has jurisdiction to determine the correct amount of tax deficiency even when that amount differs from the amount of the assessment. ORS 305.575. Here, the parties have agreed that Exhibit D to their Joint Stipulation of Facts reflects the correct amount of tax Ooma will owe if the court determines they are subject to taxation in Oregon. Accordingly, the court finds that Ooma's total tax for the periods at issue (not including penalties and interest) was $299,175.75.

The department, by letter filed March 30, 2018, requested the court's final decision affirm that—in addition to its total tax—Ooma owes "statutory interest thereon under ORS 305.220 computed from the due date of the return for each applicable period, and $299,175.75 of 100-percent failure-to-file penalties as provided by ORS 403.230(1) and ORS 305.992." Ooma did not file an objection to the department's request.

Although Ooma made no independent argument regarding the assessment of penalties or interest, its Complaint defined "Tax" as an amount equal to its assessed tax, penalties, and interest. Accordingly, it is appropriate that the court's final decision distinguish Ooma's liability for 100-percent penalties and statutory interest from its tax liability. The department's request is well taken.

III.  CONCLUSION

Assessment of the 9-1-1 tax to Ooma is not prohibited by either the Due Process Clause of the Fourteenth Amendment or the Commerce Clause of the United States Constitution.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Ooma's motion for summary judgment is denied.

IT IS FURTHER DECIDED that the department's motion for summary judgment is granted.

IT IS FURTHER DECIDED that Ooma's total tax for the quarters ending March 2013 to March 2016 is $299,175.75, as agreed by the parties in Exhibit D of their Joint Stipulation of Facts, plus statutory interest thereon under ORS 305.220 computed from the due date of the return for each applicable period, and $299,175.75 of 100-percent failure-to-file penalties as provided by ORS 403.230(1) and ORS 305.992.

Dated this ___ day of April, 2018.

_____
POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on April 13, 2018.*