# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
June 14, 2012 Session

## STATE OF TENNESSEE v. NV SUMATRA TOBACCO TRADING COMPANY

**Tenn. R. App. P. 11 Appeal by Permission from the Court of Appeals**
**Chancery Court for Davidson County**
**No. 03-1613(II)     Carol L. McCoy, Chancellor**

---

**No. M2010-01955-SC-R11-CV - Filed March 28, 2013**

---

GARY R. WADE, C.J., dissenting.

### Introduction

In November of 1998, a number of American tobacco manufacturers and a majority of the states and territories of the United States, including Tennessee, reached a settlement in litigation over tobacco-related healthcare costs. The terms of the settlement permit the tobacco manufacturers that were involved in the litigation to withhold a portion of their liability under the settlement terms based upon loss of market share in a participating state, unless the state enacts a "qualifying statute" requiring manufacturers not party to the litigation to either participate in the settlement or pay an amount into a designated escrow fund based upon annual cigarette sales. The underlying purpose of requiring non-participating manufacturers to either join in the settlement or pay into the escrow fund is to assure "a level playing field" for all manufacturers selling cigarettes in the participating states and territories. In consequence, Tennessee adopted a qualifying statute, the Tennessee Tobacco Manufacturers' Escrow Fund Act of 1999 ("Escrow Fund Act"), Tenn. Code Ann. §§ 47-31-101 to -103 (2001 & Supp. 2012), which requires "[a]ny tobacco product manufacturer selling cigarettes to consumers within the state of Tennessee" after May 26, 1999, to either become a party to the existing settlement agreement or make specified payments into a "qualified escrow fund." Id. § 47-31-103(a).

In this instance, the State of Tennessee (the "State") filed suit to force NV Sumatra Tobacco Trading Company ("NV Sumatra"), a foreign manufacturer, to conform to the statutory requirements by making a payment into the escrow fund. NV Sumatra filed a motion to dismiss, alleging lack of personal jurisdiction, which the trial court denied. After discovery between the parties, NV Sumatra filed a motion for summary judgment on the personal jurisdiction issue, which the trial court granted, holding that our courts could not

exercise jurisdiction over foreign manufacturers with such limited contacts in Tennessee. The trial court dismissed the complaint without addressing a motion the State had filed for summary judgment on its claim that NV Sumatra, as a non-participating manufacturer, owes the State payments under the Escrow Fund Act. The trial court did not, of course, conduct a trial on the merits or reserve at the conclusion of the proof a final assessment as to whether the State had established personal jurisdiction by a preponderance of the evidence. On first-tier review, the Court of Appeals reversed the trial court's ruling as to personal jurisdiction and granted the State's motion for summary judgment as to the merits of the case.

Now before this Court, NV Sumatra continues to assert that Tennessee courts may not exercise specific personal jurisdiction over it. I disagree and would affirm the judgment of the Court of Appeals on the jurisdiction issue. Although I believe the majority opinion by this Court generally sets out the appropriate standard for personal jurisdiction and correctly finds that a motion to dismiss under Tennessee Rule of Civil Procedure 12.02(2)—rather than a motion for summary judgment—is the appropriate vehicle for the disposition of the jurisdiction issue, I must dissent because, in my opinion, the statements contained in the affidavits and depositions filed in support of the respective motions for summary judgment warrant a different result.

On a Rule 12.02(2) motion to dismiss based on lack of personal jurisdiction, absent affidavits, depositions, or "live" testimony, trial courts must draw all reasonable inferences in favor of the plaintiff and otherwise accept as true the allegations supporting the complaint. I believe that the State has clearly made a prima facie showing that the contacts of NV Sumatra in Tennessee, directly and through its distributors, are sufficient to establish personal jurisdiction. Moreover, in my view, the contents of the affidavits and depositions that were filed in the trial court not only establish that NV Sumatra's contacts with Tennessee markedly exceed those of the defendant in J. McIntyre Machinery, Ltd. v. Nicastro, 131 S. Ct. 2780 (2011), the United States Supreme Court's most recent pronouncement on the subject of personal jurisdiction, but also tip the scales in favor of the State on the dispositive question before this Court.

While I would further observe that the result reached by the majority is not necessarily in conflict with the fragmented, limited ruling in McIntyre, which produced three separate opinions but none qualifying as a majority ruling, I do not agree that the essential components of McIntyre compel this Court to refrain from exercising personal jurisdiction over NV Sumatra. Because NV Sumatra has failed to demonstrate that the exercise of jurisdiction in Tennessee would be unreasonable or unfair, I believe that, based upon the sworn statements appearing in the record, the State has made a showing that justifies personal jurisdiction.

## I. Evidentiary Standards for a Rule 12.02(2) Motion

As stated by the majority and in this dissent, the trial court should have treated NV Sumatra's motion for summary judgment based upon a lack of personal jurisdiction as a supplemental motion to dismiss. See Tenn. R. Civ. P. 12.02(2). This is of no real consequence, however, because both the State and NV Sumatra chose to rely upon facts beyond the pleadings to support their arguments. The standard for adjudicating a Rule 12.02(2) motion was most recently set forth in Gordon v. Greenview Hospital, Inc., 300 S.W.3d 635, 643-45 (Tenn. 2009), which is quoted at length by the majority. The crux of the rule is that upon the filing of a motion to dismiss for lack of personal jurisdiction, "[a] trial court must take as true all the allegations in the plaintiff's complaint and supporting papers, if any, and must resolve all factual disputes in the plaintiff's favor." Gordon, 300 S.W.3d at 644; see also Chenault v. Walker, 36 S.W.3d 45, 56 (Tenn. 2001) (stating that when adjudicating Rule 12.02(2) motions, trial courts "should not credit conclusory allegations or draw farfetched inferences").[1] My initial fear is that the majority not only implies a more exacting standard than required by our rule, suggesting that "a trial court is not obligated to accept as true factual allegations . . . that are controverted by more reliable evidence and

---

[1] While the motion at issue falls under Rule 12.02(2), I find it persuasive that this Court recently observed that a Rule 12.02(6) motion to dismiss for failure to state a claim upon which relief may be granted "challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence." Webb v. Nashville Area Habitat for Humanity, Inc., 346 S.W.3d 422, 426 (Tenn. 2011). "In considering a motion to dismiss, courts 'must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences.'" Id. (quoting Tigg v. Pirelli Tire Corp., 232 S.W.3d 28, 31-32 (Tenn. 2007)). In Webb, we declined to adopt the federal "plausibility" standard for determining the sufficiency of a complaint as adopted in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), because the "fact-weighing and merits-based determination aspect of" those United States Supreme Court opinions "is at odds with" well-established principles of Tennessee civil practice.

In reaching its conclusion, this Court cited two reasons provided by the Washington Supreme Court in McCurry v. Chevy Chase Bank, FFS, 233 P.3d 861 (Wash. 2010), as well as four additional reasons based on both Tennessee-specific concerns and scholarly commentary: (1) Twombly and Iqbal mark "a substantial departure" from, and have resulted in "a loss of clarity, stability, and predictability in[,] federal pleading practice"; (2) the new federal standard "incorporates an elevation and determination of likelihood of success on the merits . . . at the earliest stage of the proceedings," a procedure that "conflicts with the strong preference embodied in the Tennessee Rules of Civil Procedure that cases stating a valid legal claim brought by Tennessee citizens be decided on their merits"; (3) the plausibility standard is unworkable because "the distinction between whether an allegation is a 'fact' or a 'conclusion' is fine, blurry, and hard to detect"; and (4) the federal standard is likely to result in an "information asymmetry" problem, under which certain types of cases (e.g., civil rights, employment discrimination, antitrust, conspiracy) are more likely to be dismissed because it is difficult to plead factual sufficiency in such cases without some limited discovery. Webb, 346 S.W.3d at 430-35.

-3-

plainly lack credibility," but also misses the mark in assessing the value of the evidence presented.

This is not an easy case. I concede that some facts recited in this record by both affidavit and deposition support the conclusion reached by the majority, but there are compelling facts, marginally greater, that support the exercise of personal jurisdiction over NV Sumatra. As indicated, my belief is that the majority has placed too much emphasis on the sworn statements favoring a dismissal at the expense of those facts that support the opposite result.

As a general guideline, I would subscribe to the proposition that each contact that a foreign defendant has with this state should be considered in the aggregate rather than in isolation, as I believe the majority has done. In considering whether the exercise of personal jurisdiction over an out-of-state defendant comports with due process, our courts must consider the nature, quality, and quantity of all of the defendant's contacts together. See Gordon, 300 S.W.3d at 644 ("Dismissal is proper only if all the specific facts alleged by the plaintiff collectively fail to establish a prima facie case for personal jurisdiction." (emphasis added)); see also id. at 649 (holding that the defendant hospital's contacts with Tennessee, "taken alone or together," did not justify the exercise of personal jurisdiction). As explained below, I would classify the collective contacts of NV Sumatra with Tennessee as sufficient to establish personal jurisdiction.

## II. Due Process

Because a decision regarding the exercise of personal jurisdiction over a defendant involves a question of law, the standard of review of a trial court's decision to grant or deny a Rule 12.02(2) motion is de novo with no presumption of correctness. Id. at 645. A threshold issue in the due process analysis is the determination of which party bears the burden of proof of personal jurisdiction and precisely what that burden entails. The majority concludes that when the defendant supports its Rule 12.02(2) motion "with affidavits or other evidentiary materials," the path NV Sumatra has chosen here, "[t]he plaintiff then bears the burden of making a prima facie showing of personal jurisdiction, based on its own evidence." Elsewhere, however, the majority observes that "[t]he plaintiff is required to establish that minimum contacts exist by a preponderance of the evidence." In my assessment, trial courts have broad discretion as to how to proceed upon the filing of a Rule 12.02(2) motion to dismiss. Depending upon the relevant circumstances, including the complexities of the case and the nature of the personal jurisdiction issue, the trial court may decide the motion either based solely upon the complaint and the affidavits filed in support of the motion, or in the alternative, based upon deposition testimony or even an evidentiary hearing. Id. at 644.

It is important to note, however, that the manner in which the trial court chooses to proceed will affect the standard of review for the motion to dismiss. If the trial court determines that it is appropriate to decide the motion without an evidentiary hearing, then "[d]ismissal is proper only if all the specific facts alleged by the plaintiff collectively fail to establish a prima facie case for personal jurisdiction." Id. If the trial court conducts an evidentiary hearing, then it may assess the credibility of any witnesses that testify to determine if the plaintiff has established personal jurisdiction under a preponderance of the evidence standard. Id.; see also Chenault, 36 S.W.3d at 56.

Federal Rule of Civil Procedure 12(b)(2), the federal counterpart to Tennessee's Rule 12.02(2), has been interpreted in this same way:

> The most common formulation found in the judicial opinions is that the plaintiff bears the ultimate burden of demonstrating that the court's personal jurisdiction over the defendant exists by a preponderance of the evidence, but needs only make a prima facie showing when the district judge restricts . . . review of the Rule 12(b)(2) motion solely to affidavits and other written evidence.

5B Charles A. Wright et al., Federal Practice and Procedure § 1351 (3d ed. 2005) (emphasis added). The Sixth Circuit Court of Appeals has specifically addressed how a plaintiff makes out a prima facie case:

> When . . . a district court rules on a jurisdictional motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(2) without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff . . . . To defeat such a motion, [the plaintiff] need only make a prima facie showing of jurisdiction.
>
> Furthermore, a "court disposing of a 12(b)(2) motion **does not weigh** the controverting assertions of the party seeking dismissal," . . . because we want "to prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff . . . alleges collectively fail to state a prima facie case for jurisdiction.

CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1262 (6th Cir. 1996) (citations omitted) (emphasis added) (quoting Theunissen v. Matthews, 935 F.2d 1454, 1459 (6th Cir. 1991)). I believe this is the proper approach, as it avoids a premature weighing of the evidence.

In this instance, the trial court decided the personal jurisdiction issue without an evidentiary hearing, and, in this appeal, neither party has challenged the procedure used. The State's burden, therefore, was limited to establishing a prima facie case for personal jurisdiction. As explained below, the State has met this burden.

## A. Minimum Contacts

The first step in the due process analysis is to determine whether the defendant has established sufficient contacts with Tennessee. The majority summarizes the varying opinions in the United States Supreme Court's two most recent personal jurisdiction decisions involving products placed into the stream of commerce by a foreign manufacturer: first, Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102 (1987), in which the Court split 4-4 between Justice O'Connor's "stream-of-commerce-plus" position and Justice Brennan's less-demanding "stream-of-commerce" approach, and, second, McIntyre, which was intended to resolve the Asahi impasse but which also failed to produce an opinion garnering at least five votes. Several state and federal courts have concluded that Justice Breyer's concurrence serves as the controlling opinion in McIntyre because it represents the "'position taken by those Members who concurred in the judgments on the narrowest grounds.'" Marks v. United States, 430 U.S. 188, 193 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976)). I agree with that observation. See, e.g., Arthur R. Miller, *McIntyre* in Context: A Very Personal Perspective, S.C. L. Rev. 465, 476 (2012) ("I view . . . [t]he McIntyre plurality opinion [a]s an open invitation to defense interests to exploit this stop sign for all it is worth. Next, we will be barring the courthouse door to all but a chosen few."); Johnjerica Hodge, Note, Minimum Contacts in the Global Economy: A Critical Guide to *J. Mcintyre Machinery v. Nicastro*, 64 Ala. L. Rev. 417, 441 (2012) ("[C]ourts should not read [McIntyre] as requiring that they apply stringent jurisdictional rules like those applied by the plurality in [McIntyre]. Such application would result in a farce of due process.").

As the majority observes, "Justice Breyer's concurrence . . . is susceptible to multiple interpretations." Clearly, Justice Breyer was content to decide McIntyre on its facts and had no interest in participating in any attempt to establish a new jurisdictional standard—either that set out in the plurality opinion by Justice Kennedy or that adopted by the New Jersey Supreme Court, see Nicastro v. McIntyre Mach. Am., Ltd., 987 A.2d 575 (N.J. 2010).[2]

---

[2] McIntyre, 131 S. Ct. at 2791 (Breyer, J., concurring) ("I think it unwise to announce a rule of broad applicability without full consideration of the modern-day consequences. In my view, the outcome of this case is determined by our precedents."); id. at 2792 ("[O]n the record present here, resolving this case requires no more than adhering to our precedents."); id. at 2792-93 ("Because the incident at issue in this case does not implicate modern concerns, and because the factual record leaves many open questions, this is an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules."); id. at 2794 ("I again reiterate that I would adhere strictly to our precedents and the limited facts found by the New

(continued...)

-6-

Because, as the majority states, "the law requires us to follow the United States Supreme Court's lead" in personal jurisdiction cases, I believe it is highly instructive to compare the sworn statements presented by the State in this instance with the three critical facts set forth in Justice Breyer's concurrence in McIntyre—facts which did not, in his view, warrant the Supreme Court's exercise of personal jurisdiction. When performing its analysis using Justice Breyer's concurrence as a guide, the majority concludes that "[i]f New Jersey lacked jurisdiction over J. McIntyre Machinery . . . then Tennessee surely lacks jurisdiction over NV Sumatra." I cannot agree with that assessment.

In McIntyre, four fingers of Nicastro's right hand were severed while he was operating a metal-shearing machine that had been purchased by his New Jersey employer. He filed a products liability suit against J. McIntyre Machinery, Ltd. ("McIntyre UK"), located in England, which had manufactured and sold the machinery to Nicastro's employer. McIntyre UK defended the suit by asserting, among other things, that the New Jersey courts lacked personal jurisdiction. While agreeing with Justice Kennedy that the state court lacked jurisdiction over McIntyre UK, Justice Breyer pointed to the three facts that the New Jersey Supreme Court had interpreted as vesting personal jurisdiction in the courts of that state and then concluded that those facts fell short:

> (1) Quantity of sales: the independent American distributor, McIntyre Machinery America, Ltd. ("McIntyre America"), had "on one occasion sold and shipped one machine to a New Jersey customer"—Nicastro's employer;

> (2) Relationship with distributors: McIntyre UK "permitted, indeed wanted" McIntyre America "to sell its machines to anyone in America willing to buy them"; and

> (3) Contacts with the national market: representatives of McIntyre UK attended trade shows in various locations in the United States (though not in New Jersey) over a period of several years.

McIntyre, 131 S. Ct. at 2791 (Breyer, J., concurring). After comparing these three pertinent facts in McIntyre with the sworn statements and deposition testimony in this record, I have concluded that NV Sumatra's contacts with Tennessee were measurably greater—not only sufficient to survive a motion to dismiss, but also, in consideration of the sworn statements as a substitute for an evidentiary hearing, sufficient to establish personal jurisdiction, even under the preponderance of the evidence standard referenced by the majority.

---

[2](...continued)
Jersey Supreme Court.").

## 1. Quantity of Sales

In concluding that McIntyre UK had insufficient contacts with New Jersey, Justice Breyer relied heavily upon the fact that there was only a single sale of a single product in New Jersey.[3] Citing World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980), and both plurality opinions in Asahi, Justice Breyer observed that none of the Supreme Court's

> precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient. Rather, [its] previous holdings suggest the contrary. . . .
>
> Here, the relevant facts found by the New Jersey Supreme Court show no "regular . . . flow" or "regular course" of sales in New Jersey; and there is no "something more," such as special state-related design, advertising, advice, marketing, or anything else.

McIntyre, 131 S. Ct. at 2792 (Breyer, J., concurring) (third alteration in original) (emphasis added).

The quantity of sales in the case before us stands in stark contrast to the single transaction in McIntyre. According to licensed distributor reports that were filed with the State of Tennessee, 1,340,000 of NV Sumatra's United brand cigarettes were stamped for sale in Tennessee between January 1 and December 31, 2000. Between January 1 and December 31, 2001, another 9,595,200 United brand cigarettes were stamped for sale in Tennessee. Between January 1 and December 31, 2002, 657,600 more United brand cigarettes were stamped for sale in Tennessee. Thus, the quantity of NV Sumatra's cigarette sales in Tennessee from 2000 to 2002 amounted to 11,592,800 individual cigarettes, 579,964 packs, or nearly 58,000 cartons. While the majority concedes that this quantity of sales is, quoting its exact language, "nothing to sneeze at," it concludes that the numbers are "not dispositive" because "NV Sumatra had almost nothing to do with" the sales, placing the cigarettes "into the international stream of commerce without anything 'more' to demonstrate a specific

---

[3] The record before the Court appeared to be unclear on this point, with Justice Kennedy stating that "no more than four machines (the record suggests only one), including the machine that caused the injuries that are the basis for this suit, ended up in New Jersey." McIntyre, 131 S. Ct. at 2786 (plurality opinion) (citation omitted). Justice Ginsburg suggested that McIntyre UK had resisted "Nicastro's efforts to determine whether other McIntyre machines had been sold to New Jersey customers." Id. at 2797 n.3 (Ginsburg, J., dissenting). Ultimately, the number of machines did not appear to be as important to Justice Ginsburg and the other dissenters as the fact that the one machine that indisputably caused the injury to Nicastro arrived in his New Jersey workplace "not randomly or fortuitously, but as a result of the U.S. connections and distribution system that McIntyre UK deliberately arranged." Id. at 2797.

interest in Tennessee."[4]  The portion of Justice Breyer's opinion quoted above suggests, however, that <u>either</u> a "'regular . . . flow' or 'regular course' of sales" in the forum state <u>or</u> "'something more,' such as special state-related design, advertising, advice, marketing, or anything else" may support a finding of sufficient contacts.  While the majority appears to assume that only the latter can support such a conclusion, a number of courts have interpreted the language in Justice Breyer's concurrence in the disjunctive and ruled that a "regular flow" or "regular course" of sales is or could be sufficient to establish that an out-of-state defendant had minimum contacts with the forum state.  <u>See, e.g.</u>, <u>UTC Fire & Sec. Ams. Corp. v. NCS Power, Inc.</u>, 844 F. Supp. 2d 366, 376 (S.D.N.Y. 2012) ("[Justice Breyer's] concurrence did not foreclose the possibility that a court might exercise jurisdiction where there is a 'regular course of sales' of defendant's goods in the forum state, <u>or</u> 'something more, such as special state-related design, advertising, advice, marketing or anything else.'" (emphasis added) (quoting <u>McIntyre</u>, 131 S. Ct. at 2791-92 (Breyer, J., concurring))); <u>Huddleston v. Fresenius Med. Care N. Am.</u>, No. 1:10CV713, 2012 WL 996959, at *5 (S.D. Ohio Mar. 22, 2012) (same).

A recent decision by the Oregon Supreme Court is instructive.  A Taiwanese manufacturer of battery chargers supplied its products for installation in motorized wheelchairs built by an Ohio corporation, which then sold the wheelchairs throughout the United States, including in Oregon.  <u>Willemsen v. Invacare Corp.</u>, 282 P.3d 867, 869 (Or. 2012).[5]  After being sued on a products liability claim, the Taiwanese manufacturer challenged the exercise of personal jurisdiction, pointing out that it was the Ohio corporation that had chosen to sell its products in Oregon and arguing "that, under [<u>McIntyre</u>], the mere fact that [the Taiwanese manufacturer] may have expected that its battery chargers might end up in Oregon is not sufficient to give Oregon courts specific jurisdiction over it."  <u>Id.</u> at 872. Relying on Justice Breyer's concurrence as the controlling opinion in <u>McIntyre</u>, however, the

---

[4] The majority seeks to minimize the impact of this highly significant fact by citing to external Federal Trade Commission data, which show that the number of NV Sumatra cigarettes sold in Tennessee from 2000 to 2002 was quite small relative to the total amount of cigarettes sold, or even given away, in the United States by the major domestic cigarette manufacturers during the same time period. This information, external to the record in this case, is irrelevant to the central issue of whether the exercise of personal jurisdiction over NV Sumatra comports with due process. I can only assume that the majority searched for and included the figures for the total sales of cigarettes in the United States in its opinion to try and understate the effect of the raw number of cigarettes that NV Sumatra sold in Tennessee, a fact that weighs against the majority's ultimate conclusion. Whatever the purpose, I would observe that the majority has gone outside the record and otherwise failed to consider the facts of this case under the proper standard of review.

[5] Specifically, during the relevant period from 2006 to 2007, the Ohio corporation sold 1166 motorized wheelchairs in Oregon, nearly ninety-five percent of which came with battery chargers manufactured by the Taiwanese corporation. The Taiwanese corporation received approximately $30,929 for the chargers that the Ohio corporation provided to Oregon purchasers. <u>Id.</u> at 870-71.

court found that "the sale of over 1,100 [of the Taiwanese manufacturer's] battery chargers within Oregon over a two-year period shows a 'regular . . . flow' or 'regular course' of sales" in Oregon. Id. at 874 (second alteration in original) (quoting McIntyre, 131 S. Ct. at 2792 (Breyer, J., concurring)) (internal quotation marks omitted). This volume of sales "was sufficient to show a 'regular course of sales' and thus establish sufficient minimum contacts for an Oregon court to exercise specific jurisdiction over" the foreign defendant. Id. at 875 (emphasis added). Other courts have similarly distinguished McIntyre and held that a foreign defendant is subject to personal jurisdiction in the forum state based upon the volume of sales in that state. See, e.g., Graham v. Hamilton, No. 3:11-609, 2012 WL 893748, at *4 (W.D. La. Mar. 15, 2012) (holding that "the McIntyre concurrence does not govern the facts of this case" because, unlike the single sale to New Jersey in McIntyre, the record showed that the foreign defendant "places over 800,000 vehicles into the U.S. market each year," many of which "would likely be sold in" the forum state); Ainsworth v. Cargotec USA, Inc., No. 2:10-CV-236-KS-MTP, 2011 WL 4443626, at *7 (S.D. Miss. Sept. 23, 2011) (holding that the case was "remove[d] . . . from the scope of McIntyre's applicability" because the out-of-state defendant had sold 203 forklifts to customers in the forum state over the previous decade, generating over $5.3 million in sales).

I agree with the interpretation of Justice Breyer's concurring opinion set forth by the Oregon Supreme Court. In my view, Justice Breyer's opinion authorizes a finding of minimum contacts if there is either a "'regular . . . flow' or 'regular course' of sales" in a forum state or "'something more,' such as special state-related design, advertising, advice, marketing, or anything else." McIntyre, 131 S. Ct. at 2792 (Breyer, J., concurring). The sale of over 11.5 million products over the course of roughly three years clearly constitutes a "regular flow" or "regular course" of sales for that period. This regular course of sales in Tennessee is reason alone to hold that the State has made out a prima facie case for the exercise of personal jurisdiction over NV Sumatra. Furthermore, the State carried its burden even under a preponderance of the evidence standard because the "something more," as stated by Justice Breyer as an alternative method of proving personal jurisdiction, has also been established by the sworn statements in the record, which the parties deemed to constitute all of the proof necessary on the subject.

## 2. Relationship with Distributors
The second pertinent fact in McIntyre, as set forth in Justice Breyer's concurrence, is that McIntyre UK "permitted, indeed wanted," McIntyre America "to sell its machines to anyone in America willing to buy them." McIntyre, 131 S. Ct. at 2791 (Breyer, J., concurring). Justice Ginsburg describes the relationship between McIntyre UK and McIntyre America in further detail in her dissenting opinion. While McIntyre America was the exclusive distributor in the United States for McIntyre UK during the relevant period, "the two companies were separate and independent entities with 'no commonality of ownership

or management.'" McIntyre, 131 S. Ct. at 2796 (Ginsburg, J., dissenting) (quoting Nicastro v. McIntyre Mach. Am., Ltd., 945 A.2d 92, 95 (N.J. Sup. Ct. App. Div. 2008)); see also id. at 2786 (plurality opinion) ("[A]n independent company agreed to sell J. McIntyre's machines in the United States . . . and there is no allegation that the distributor was under J. McIntyre's control."). Thus, McIntyre UK clearly had a direct, and yet independent, relationship with an American distributor designed to market and sell its products throughout the United States. While it is undisputed that a significant number of NV Sumatra's United brand cigarettes were sold in the United States—and in Tennessee—from 2000 to 2002, this particular foreign manufacturer's relationship with its American distributor, FTS Distributors ("FTS"), is less clear, but still sufficient to establish personal jurisdiction.

The State's primary source of information regarding the sale of NV Sumatra's United brand cigarettes in Tennessee and a number of other states is the sworn affidavit and deposition testimony of Basil Battah, the president of FTS. FTS was an importer and distributor of cigarettes based out of the Miami Free Zone—the foreign trade zone in Miami, Florida—and was the only distributor of United brand cigarettes in the United States during the relevant period. Battah testified that the first United brand cigarettes that FTS bought were from a California company called Pacific Coast Duty Free in late 1999 or 2000. The transaction was initiated by Pacific Coast Duty Free; subsequently, according to Battah, "the representative of NV Sumatra asked us to be the importer of the product." After FTS sold all of the cigarettes it had initially purchased, it "wanted more" and began to place orders by telephone and facsimile for United brand cigarettes to three separate entities simultaneously: NV Sumatra; Unico Trading, a distributor based in Singapore; and Nabil Hawe, an individual based out of London who became a primary point of contact for FTS. Battah testified that, at least initially, he had assumed that Hawe worked for NV Sumatra, when, in fact, Hawe worked for a third entity, Silmar Trading, which was based in the British Virgin Islands. Battah testified that he would often place a direct call to NV Sumatra in Indonesia to follow up on orders. The shipments originated in Indonesia but usually came through Singapore, London, or both, en route to FTS in Miami. The certificates of origin and bills of lading in this record indicate that, whatever the stops along the way, the United brand cigarettes left NV Sumatra in Indonesia identifying their final destination as the United States (specifically, Miami).

Despite the involvement of Unico Trading and Silmar Trading as possible intermediaries, Battah's testimony indicates that he had a direct relationship with NV Sumatra. When asked whether FTS had "enter[ed] into a written or oral contract with anyone from NV Sumatra about distributing their cigarettes," Battah answered definitively: "We had an oral agreement that I was their exclusive distributor. We wanted to put it in writing but

we never got that far because they just stopped selling us cigarettes completely."[6] When asked with whom he had those discussions, Battah responded: "With . . . several people from NV Sumatra. A contract was going to be written. Never got that far. They gave me their word that I was their exclusive and only distributor for United States of America." Battah further testified that "[t]he real relationship was between myself and NV Sumatra. They made [the cigarettes], I sold them. . . . Everybody else in between w[ere] smoke screens and mirrors and were unnecessary."

A document dated July 9, 2001, executed by Timin Bingei, the Executive Director of NV Sumatra, indicates that, at least as of that date, NV Sumatra did not have a direct relationship with FTS with regard to the United brand cigarettes. The document provides that NV Sumatra had "appointed Unico Trading . . . as [its] sole agent for sale and marketing cigarettes bearing the name 'United.'" It also states that NV Sumatra consented "to allow Unico . . . to appoint Silmar Trading . . . to be its exclusive-buyer to distribute 'United' cigarettes for sale in the United States of America." Battah, who had been working directly with Hawe of Silmar Trading to market and build the United brand throughout the United States, conceded that this document "made it very clear" that NV Sumatra did not want to have an agreement directly with FTS.

On July 25, 2001, two weeks after executing this document, NV Sumatra sent a facsimile[7] containing the following statement:

---

[6] The majority declines to accredit Battah's allegations as to his agreement with NV Sumatra on the grounds that these allegations constitute "legal conclusions" that the State has not corroborated with "documentary or other reliable evidence." While this maneuver allows the majority to brush aside facts that do not support its conclusion, its stated grounds for ignoring Battah's allegations are unsound. Initially, an individual's testimony that he had an agreement with some other entity or individual is not a legal conclusion that can be ignored in its entirety. Of course, if an individual states that he and another party have a verbal agreement that is legally enforceable under Tennessee law, a court would be correct in declining to accredit the testimony to the extent that it attempts to establish the legal validity of an oral contract. But that is not the case here. In this instance, the State has offered Battah's testimony as proof that representatives of NV Sumatra communicated directly with Battah regarding the sale of United brand cigarettes in the United States. Because Battah's testimony has nothing to do with the legal validity of any agreement between him and NV Sumatra, it should not be disregarded as a "legal conclusion." See Webb, 346 S.W.3d at 434 (discussing the "analytical distinction between factual assertions and legal conclusions"). Moreover, contrary to the majority's analysis, there is no requirement that the State corroborate Battah's testimony with "documentary or other reliable evidence."

[7] The record is unclear as to whom the facsimile was sent. The addressee is handwritten as "Mr. Basil," but the document refers to FTS in the third person.

Your report on the United cigarettes you faxed to us some time ago stated that the said cigarettes could be purchased in California, Washington, Texas, Arizona, Louisiana, Mississippi, Georgia, South and North Carolina, New Hampshire, Oklahoma, **Tennessee** and Kentucky. Most of States mentioned are subject to Escrow Fund Act.

We are wondering whether the importer or any party has opened an escrow account with the States Attorney General. We receive[d] notice from the Office of the Attorney General in the 46 States subject to escrow such as **Tennessee**, New Hampshire, California, Pennsylvania, etc. to request confirmation whether our cigarettes were sold in their States and whether we have opened an account related to the escrow fund.

. . . .

Since United cigarettes are imported an[d] distributed in [Miami, Florida,] which is not subject to the requirements of the Escrow Fund, but indirectly distributed to states which require an Escrow Fund, please request FTS to check with their lawyer, Barry Boren on how to respon[d] to the said notice.

(Emphasis added.) This, of course, suggests that NV Sumatra was well aware "some time" prior to July 25, 2001 that FTS was importing and distributing its United brand cigarettes throughout the United States, including in Tennessee. This information is consistent with escrow fund notices in the record from the Tennessee Attorney General's Office to NV Sumatra in Indonesia, which are dated March 21 and May 7, 2001. The notices describe the potential liability of tobacco products manufacturers under the Escrow Fund Act and request NV Sumatra to return a completed "Certificate of Compliance with the Act" and deposit funds if necessary.

Battah testified that he had numerous meetings with representatives of NV Sumatra, with Hawe from Silmar Trading, and with representatives of Unico Trading. The purposes of these meetings were to formalize the American distribution arrangement for United brand cigarettes and to obtain assurances that NV Sumatra would change the packaging of its cigarettes to alleviate concerns of the United States Customs Service.[8] The first such meeting

---

[8] Apparently, the Customs Service had issued a "marking notice" to FTS in May of 2001, based upon its determination that the packaging of the cigarettes would be confusing to consumers, as it did not conspicuously state that it was made in Indonesia and could be interpreted as the product having been "Made in the U.S.A." NV Sumatra secured a waiver for all of the cigarettes already in the possession of FTS at that time.

-13-

took place in November of 2001 in Beijing, China, and was initiated by NV Sumatra. The attendees included Battah, Hawe, and Bingei, NV Sumatra's Executive Director. At the Beijing meeting, the parties discussed the product marking issue, whether NV Sumatra should join the November 1998 settlement with the states, and sales forecasts for United brand cigarettes in the United States. With regard to the latter, FTS "presented all of the facets of every sale, where it went, which states we needed to target and continue our business." Battah showed Bingei and the others present at the meeting charts indicating the number of cigarettes that were being sold in each state, including Tennessee. Battah testified that he presented additional sales figures at a subsequent meeting with Hawe and officials from NV Sumatra and Unico Trading, which took place in Miami in 2002.[9] Ultimately, NV Sumatra notified Battah via telephone in February of 2002 that it would no longer pursue sales in the United States market. The relationship terminated when Battah sold his remaining inventory of United brand cigarettes.

Based upon the contents of the record evidencing the relationship between NV Sumatra and its distributors, including FTS, the majority describes NV Sumatra as an innocent bystander:

> When Mr. Battah solicited NV Sumatra's cooperation in targeting the Tennessee market, NV Sumatra brushed aside his entreaties. As soon as NV Sumatra learned of its products' sales in Tennessee – and the legal ramifications of these sales – it severed its few ties with FTS and sent FTS no more cigarettes.
>
> . . . .
>
> Once NV Sumatra became aware that it could be sued in states that had adopted the Tobacco Manufacturers' Escrow Fund Act, the company withdrew its products from the United States market. NV Sumatra deliberately chose *not* to avail itself of the privilege of conducting business in Tennessee.

This is not an entirely unreasonable inference from the allegations in the record. However, when viewed in the light most favorable to the State, those same allegations are subject to

---

[9] Battah's recollection of this meeting contradicts his own earlier deposition testimony, in which he was asked whether any representatives from NV Sumatra had ever come to Miami and he responded, "Not to my knowledge." An affidavit from an NV Sumatra representative in May of 2010, more than eight years after the meeting allegedly took place, stated that NV Sumatra's "corporate records do not reflect any trip to the United States by anyone from [NV Sumatra] during the time period 2001 through 2004." Battah's attorney, Barry Boren, averred that "[s]uch a meeting may have occurred, but after the passage of so many years I cannot say whether it did or did not take place."

a more plausible alternative interpretation. That is, NV Sumatra had an obvious interest in engaging the United States market because a California distributor, Pacific Coast Duty Free, already had a large inventory of its United brand cigarettes on hand. When Pacific Coast Duty Free could not or would not sell NV Sumatra's cigarettes, it sought out another distributor, FTS, to purchase the inventory. NV Sumatra made informal assurances to Battah, who proceeded under the assumption that he was dealing directly with the manufacturer of the United brand cigarettes. This mutually beneficial relationship flourished until NV Sumatra received escrow fund notices from the Tennessee Attorney General's Office in March and May of 2001. In July of 2001, NV Sumatra made efforts to clarify the steps in the supply chain and seek counsel regarding the legal ramifications of its sales of millions of cigarettes in Tennessee and the other states subject to the escrow fund. NV Sumatra called a meeting in Beijing in November of 2001 to gather information about the volume of sales that were being made on its behalf in the United States by FTS, as well as the regulatory implications of continuing to cultivate that market. Finally, in February of 2002, nearly one year after first having been notified of its potential liability under the Escrow Fund Act and seven months after confirming this potential liability via a facsimile to its distributors, NV Sumatra decided to pull out of the United States market entirely. Of course, it kept the profits it had accumulated from targeting American consumers and did so without paying a cent into the escrow funds of Tennessee and the other participating states, thereby "unleveling" the playing field among cigarette manufacturers. When sued by the states, NV Sumatra used the layers of its distribution chain to distance itself from FTS and claimed that it had never purposefully availed itself of the United States market.

My primary purpose in developing this alternative narrative is, in part, to demonstrate the fallibility of attempting to assess witness credibility based upon allegations in a complaint, the contents of an affidavit, or the words in a transcript of a deposition. See Sampson v. Wellmont Health Sys., 228 S.W.3d 124, 135 (Tenn. Ct. App. 2007) (concluding that when a proceeding is "strictly 'on the papers,'" such as a matter decided on affidavits and deposition transcripts, "testimony cannot be disregarded on the basis of a lack of credibility" (citing Byrd v. Hall, 847 S.W.2d 208, 216 (Tenn. 1993))). At this stage of the proceedings, the duty of the trial court was to construe the sworn statements in the light most favorable to the State without weighing the credibility of the affiants or the reliability of their assertions. In my view, the State has made a prima facie case that NV Sumatra was aware of the sales of its United brand cigarettes in Tennessee and throughout the United States and purposefully availed itself of those markets through its independent distributors. It is also my opinion that other activities of NV Sumatra and its distributors buttress my conclusion that, based upon this limited record, the State would even be able to prove personal jurisdiction by a preponderance of the evidence standard.

### 3. Contacts with the National Market

The third and final pertinent fact mentioned by Justice Breyer is that representatives of McIntyre UK had attended trade shows in various locations in the United States, including Chicago, Las Vegas, New Orleans, Orlando, San Diego, and San Francisco. McIntyre, 131 S. Ct. at 2791 (Breyer, J., concurring). These actions were representative of the British manufacturer's efforts to target the United States market as a whole. The majority contrasts these actions with those of NV Sumatra and concludes that there is a "paucity of national contacts." The majority appears to believe that the most important facts are those that "the record does not reveal," including NV Sumatra's failure to create "an aggressive advertising campaign aimed at the United States," to send "representatives to trade shows in the United States," or to engage in "Internet sales targeting United States markets." This assessment fails to take into account the numerous activities in which NV Sumatra clearly engaged, both directly and through its distributors, that did target the United States and Tennessee markets.

This case raises the question of whether a foreign corporation is subject to personal jurisdiction in a particular forum state where it purposefully avails itself of the United States market and, as a result of this targeting, its products end up in the forum state and subject it to liability there. Justice Kennedy's plurality opinion in McIntyre supports the view that the targeting of a national market can never give rise to personal jurisdiction in a particular state, and proposes that the foreign defendant must also have purposeful and significant contacts with the forum state itself. See McIntyre, 131 S. Ct. at 2790 (plurality opinion) ("These facts may reveal an intent to serve the U.S. market, but they do not show that J. McIntyre purposefully availed itself of the New Jersey market."). Justice Ginsburg, in dissent, emphatically asserted that a foreign manufacturer targeting the entire United States market should be subject to personal jurisdiction anywhere its products cause injury. Id. at 2801 (Ginsburg, J., dissenting) ("McIntyre UK, by engaging McIntyre America to promote and sell its machines in the United States, 'purposefully availed itself' of the United States market nationwide, not a market in a single State or a discrete collection of States. McIntyre UK thereby availed itself of the market of all States in which its products were sold by its exclusive distributor."). By explicitly rejecting the plurality's "seemingly strict no-jurisdiction rule," id. at 2793 (Breyer, J., concurring), Justice Breyer's concurrence is more equivocal but leaves for another day the answer to the question of whether marketing and sales activities targeting the United States as a whole may subject a foreign entity to personal jurisdiction in a particular state.

In the case before us, the record indicates that FTS took the lead in marketing and distributing NV Sumatra's United brand cigarettes to the United States market. In so doing, however, FTS built upon the foundation already laid by NV Sumatra and worked in concert with Silmar Trading, another approved entity in the supply chain of United brand cigarettes,

through its employee, Hawe.  At least two activities of NV Sumatra related to our nation's market support the exercise of personal jurisdiction by this state.

First, it appears that NV Sumatra took several affirmative steps to weave its way through the web of federal regulations required to sell cigarettes in the United States.  In 1995, years prior to the formation of FTS, NV Sumatra applied for, and received, a United States trademark for the United brand cigarettes.[10]  NV Sumatra also explicitly consented to the sale of its United brand cigarettes in the United States, at least during the second half of 2001.  On July 9, 2001, NV Sumatra submitted an ingredient list for its United brand cigarettes to the Centers for Disease Control and Prevention, as required by federal law.[11] NV Sumatra worked with FTS by facsimile and telephone to assist the latter in obtaining approval from the Federal Trade Commission for the rotation of warnings to appear on the packages of United brand cigarettes.  The cartons of United brand cigarettes arrived in Miami with the Surgeon General's warning already affixed to the label, and NV Sumatra wrote a letter to the United States Customs Service when FTS was notified of the marking issue with the imported cigarettes.

Second, NV Sumatra, both directly and through its other distributors, worked with FTS to distribute, market, and sell cigarettes in a variety of ways.  After NV Sumatra approved Unico Trading to appoint Silmar Trading as its exclusive distributor to the United States market in July of 2001, Hawe "came to Miami several times" to discuss "marketing strategy and building the brand and making [United cigarettes] a nationwide brand."  The mutual goal of Battah and Hawe "was to sell a thousand master cases per state."  To further the goal of selling 1000 master cases—the equivalent of 500,000 packs or 10,000,000 cigarettes—in Tennessee and every other state, Battah asked for, and NV Sumatra provided, promotional materials for the United brand cigarettes to be placed in retail stores.  Specifically, NV Sumatra provided "eight-by-eleven posters that said 'The Spirit of United,' and they had the health warning on them."[12]  Battah also created magazine advertisements and attended trade shows on NV Sumatra's behalf.  It was at one such trade show that he met the Tennessee distributors to whom he sold NV Sumatra's products.  Taken together, all of

---

[10] NV Sumatra reapplied for the trademark in 2003.

[11] Because the State entered a joint stipulation that FTS submitted the ingredient list, NV Sumatra asserts that the State should be estopped from arguing to the contrary.  The record indicates that the list was submitted by a G.A. Avram of a law office in Winston-Salem, North Carolina, on behalf of his client, "N.V. Sumatra Tobacco Trading Co."

[12] NV Sumatra claims that this testimony of Battah is contradicted by later testimony that FTS produced some point-of-purchase and advertisement materials.  Of course, these events are not mutually exclusive; FTS easily could have received the original marketing materials from NV Sumatra and also produced additional copies emblazoned with its own contact information.

these activities by NV Sumatra are indicative of the "something more" described in Justice Breyer's concurrence.

### 4. Summary of Facts Pertinent to Minimum Contacts Analysis

In summary, the record shows that the three pertinent facts deemed inadequate in McIntyre for New Jersey courts to exercise jurisdiction support the opposite conclusion here. First, there was a "regular flow" and "regular course" of sales of NV Sumatra's United brand cigarettes into Tennessee from 2000 to 2002. Second, NV Sumatra delivered its products into the international stream of commerce with awareness that they were being sold in great quantities in Tennessee through its distributors, and that its distributors were specifically targeting the Tennessee market. Finally, NV Sumatra, both directly and through its other distributors, appears to have provided direct assistance to FTS, its American distributor, to help it achieve its own sales goals. Because NV Sumatra's contacts with Tennessee in these three areas exceed, by a clear margin, those that the defendant foreign manufacturer had with New Jersey in McIntyre, as set forth in Justice Breyer's concurring opinion, the State has made a prima facie showing of minimum contacts.

### B. Reasonableness Factors

The finding that the State has set forth a prima facie case of minimum contacts crosses the threshold for the personal jurisdiction analysis. There is a second step in the due process analysis in which the burden shifts to NV Sumatra to show that the exercise of personal jurisdiction by Tennessee would be unfair or unreasonable.[13] If NV Sumatra carries this burden, the courts of this state should not exercise jurisdiction. As Justice O'Connor wrote in her plurality opinion in Asahi,

> the determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors. A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies."

480 U.S. at 113 (plurality opinion) (emphasis added) (quoting World–Wide Volkswagen, 444 U.S. at 292).

---

[13] Because the majority concluded that the State did not meet its burden as to minimum contacts, it did not reach this second prong of the due process analysis.

NV Sumatra has based its personal jurisdiction arguments on the minimum contacts prong of the analysis, but has offered no proof, much less carried its burden of proof, on the issue of reasonableness. In any event, I concur with the reasonableness analysis by our Court of Appeals and that of the South Carolina Supreme Court in a case involving the same analysis and nearly identical facts. See State v. NV Sumatra Tobacco Trading Co., 666 S.E.2d 218, 223 (S.C. 2008).[14] The State has a compelling financial interest in adjudicating this dispute against NV Sumatra and collecting the unpaid escrow funds from 2000, 2001, and 2002. Moreover, "[t]he State also has an interest in protecting its citizens and in enforcing the important social policies that form the basis for the Escrow Fund Act." State v. NV Sumatra Tobacco Trading Co., No. M2010-01955-COA-R3-CV, 2011 WL 2571851, at *26 (Tenn. Ct. App. Aug. 24, 2011). And finally,

> [w]hile it may be inconvenient for [NV] Sumatra to travel to the United States to defend the action against it, the State's interest in exercising jurisdiction outweighs any such inconvenience. The State has a valid interest in protecting itself against any suits that arise from a person smoking the United brand of cigarettes. Given the volume of those cigarettes sold within [this state], it is reasonable for [NV] Sumatra to be haled into a [Tennessee] court.

NV Sumatra Tobacco Trading Co., 666 S.E.2d at 223.

In my view, it is neither unfair nor unreasonable, under these circumstances, for Tennessee to exercise jurisdiction over NV Sumatra, and there is no denial of the right to due process. The words of Hillel the Elder, a legendary Jewish leader in the time of King Herod, apply to this jurisdictional issue in the context of the integrity of the historic tobacco settlement: "If not us, who? If not now, when?"

### III. Conclusion

For the reasons set forth in this opinion, I believe that the State has not only made a prima facie showing of minimum contacts, as is required, but has exceeded that threshold, and that NV Sumatra has failed to demonstrate that it would be unreasonable for Tennessee courts to exercise personal jurisdiction. In consequence, I would hold that NV Sumatra is not entitled to a dismissal based upon lack of personal jurisdiction; unlike the Court of Appeals, however, instead of granting the motion for summary judgment by the State, I would remand the case to the trial court for consideration of that summary judgment motion

---

[14] The majority is correct in noting that the South Carolina Supreme Court employed the "stream-of-commerce" test espoused by Justice Brennan in Asahi, rather than the more rigorous "stream-of-commerce-plus" test of Justice O'Connor that we use in Tennessee. While this difference renders the South Carolina court's minimum contacts analysis of limited value to us, it does not impact the persuasiveness of its reasonableness analysis.

and any defenses that the trial court did not consider after granting NV Sumatra's competing motion.[15]

I am authorized to state that Justice Lee, who has made substantial contributions to this analysis, joins in this dissenting opinion.

_____

GARY R. WADE, CHIEF JUSTICE

---

[15] For example, I would require NV Sumatra to raise its challenges to the constitutionality of the Escrow Fund Act in the trial court.